Earl J. TESCHENDORF
and Linda Teschendorf,
Plaintiffs,

v.

STATE FARM INSURANCE COMPANIES,
Reliance National Indemnity Co. and
American Family Mutual Insurance Co.,
Defendants.

Bernard J. SHIRA and Maria Shira,
Plaintiffs-Appellants,

v.

RELIANCE NATIONAL INDEMNITY Co.,
Defendant,

AMERICAN FAMILY INSURANCE Co.,
Defendant-Respondent-Petitioner.

Supreme Court

*No. 2003AP3521. Oral argument November 8, 2005.
—Decided July 7, 2006.*

2006 WI 89

(Also reported in 717 N.W.2d 258.)

123

For the defendant-respondent-petitioner there were briefs by *Terry J. Booth* and *Piper & Schmidt,* Milwaukee, and oral argument by *Terry J. Booth.*

For the plaintiffs-appellants there was a brief by *Eric S. Darling* and *Schmidt, Darling & Erwin,* Milwaukee, and oral argument by *Eric S. Darling.*

An amicus curiae brief was filed by *Martha H. Heidt* and *Doar, Drill & Skow, S.C.,* Baldwin, on behalf of the Wisconsin Academy of Trial Lawyers.

¶ 1. DAVID T. PROSSER, J. American Family Mutual Insurance Company (American Family) seeks review of a published decision of the court of appeals,[1] which reversed a summary judgment granted to American Family by the Milwaukee County Circuit Court, Jeffrey Kremers, Judge. The issue presented is whether an insurer may reduce the uninsured motorist coverage limits in its policy by amounts paid under a worker's

---

[1] *Teschendorf v. State Farm Ins. Co.,* 2005 WI App 10, 278 Wis. 2d 354, 691 N.W.2d 882.

129

compensation law, where the amounts paid go to the State of Wisconsin Work Injury Supplemental Benefit Fund (the Fund) rather than the insured or any person related to the insured.

¶ 2. We conclude that Wis. Stat. § 632.32(5)(i)2. (2001–02)[2] does not allow an insurer to reduce uninsured motorist policy limits by worker's compensation payments that are not made to or on the behalf of the insured, the insured's heirs, or the insured's estate. Accordingly, we affirm the court of appeals and hold that American Family cannot reduce its uninsured motorist policy limits by worker's compensation payments made to the Fund.

## I. BACKGROUND

¶ 3. The facts are undisputed. Scott Shira (Scott) died in the course of his employment when an uninsured motorist's vehicle struck the car in which he and his passenger, Earl Teschendorf, were riding.[3] The accident occurred January 16, 1999, in Woodbury, Minnesota. Scott was 33 years old. Because he was unmarried and had no dependents, his worker's compensation death benefit was paid to the Fund as required by Wis. Stat. § 102.49(5)(b) instead of Scott's estate.[4] Of the $173,448.00 in worker's compensation benefits paid

---

[2] All references to the Wisconsin Statutes are to the 2001–02 edition unless otherwise indicated.

[3] The claims of Earl Teschendorf are not before this court.

[4] Wisconsin Stat. § 102.49(5)(b) states:

In addition to the payment required under par (a) [$5000], in each case of injury resulting in death leaving no person dependent for support, the employer or insurer shall pay into the state treasury the amount of the death benefit otherwise payable . . . .

130

because of Scott's death, $159,900.00 was paid to the Fund; $12,500 was paid to Scott's parents for funeral and other expenses; and $1048 was paid to medical providers.

¶ 4. Scott had purchased an automobile insurance policy from American Family with uninsured motorist coverage limits of $150,000. After his death, Scott's parents, Bernard and Maria Shira (the Shiras), brought a wrongful death action, based on Minnesota law, against American Family to recover the uninsured motorist benefits under Scott's policy. They sought $8000 in funeral expenses plus damages for loss of society and companionship.

¶ 5. Relying upon the reducing clause in the policy,[5] American Family moved for summary judgment, claiming the uninsured motorist policy limits were reduced to $0 by the amount of worker's compensation benefits paid to the Fund.

¶ 6. Wisconsin Stat. § 632.32(5)(i) authorizes reducing clauses like the one in the American Family policy. Paragraph (i) states:

A policy may provide that the limits under the policy for uninsured or underinsured motorist coverage

---

[5] Scott's uninsured motorist coverage with American Family contained the following reducing clause:

The limits of liability of this coverage will be reduced by:

1. A payment made by the owner or operator of the uninsured motor vehicle or organization which may be legally liable.

2. A payment under the Liability coverage of this policy.

3. A payment made or amount payable because of bodily injury under any workers' compensation or disability benefits law or any similar law.

131

for bodily injury or death resulting from any one accident shall be reduced by any of the following that apply:

1. Amounts paid by or on behalf of any person or organization that may be legally responsible for the bodily injury or death for which the payment is made.

2. *Amounts paid or payable under any worker's compensation law.*

3. Amounts paid or payable under any disability benefits laws.

Wis. Stat. § 632.32(5)(i) (emphasis added).

¶ 7. The circuit court granted American Family summary judgment. It held that (1) Minnesota law governs the wrongful death action; (2) Wisconsin law governs the interpretation of the insurance policy; and (3) Wis. Stat. § 632.32(5)(i)2. unambiguously permits reducing clauses that reduce uninsured motorist limits by the amount of worker's compensation benefits paid to the Fund. The Shiras appealed.

¶ 8. The court of appeals reversed. In a split decision, the court of appeals concluded that both Wis. Stat. § 632.32(5)(i)2. and the reducing clause in the policy unambiguously allow a reduction in policy limits only for those worker's compensation payments made or payable to the insured, the insured's heirs, or the insured's estate. *Teschendorf v. State Farm Ins. Co.,* 2005 WI App 10, ¶ 1, 278 Wis. 2d 354, 691 N.W.2d 882. The court of appeals held that the phrase "to the insured" is implicit in sub. (5)(i)2. based on the context of the overall statutory scheme. *Id.,* ¶ 13. In dissent, Judge Ralph Adam Fine contended that both sub. (5)(i)2. and the policy unambiguously allow for coverage limits to be reduced by any worker's compensation

payment made, regardless of the recipient. *Id.,* ¶ 20 (Fine, J., dissenting). We granted American Family's petition for review.

## II. STANDARD OF REVIEW

¶ 9. We review a decision on summary judgment using the same methodology as the circuit court. *Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). Summary judgment is appropriate where the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Wis. Stat. § 802.08(2). Since the facts are not in dispute, only questions of law remain. Statutory interpretation and the interpretation of an insurance policy present questions of law that we review de novo. *Mau v. N.D. Ins. Reserve Fund,* 2001 WI 15, ¶¶ 12, 28, 248 Wis. 2d 1031, 637 N.W.2d 45.

## III. THE STATUTE

¶ 10. We first examine Wis. Stat. § 632.32(5)(i)2. to determine whether it permits an insurer to reduce uninsured motorist limits by amounts paid by a worker's compensation carrier to the Fund. If sub. (5)(i)2. does not permit reducing clauses to function in the manner American Family suggests, then the policy must conform to the statute and our inquiry ends. *See Theis v. Midwest Sec. Ins. Co.,* 2000 WI 15, ¶ 13, 232 Wis. 2d 749, 606 N.W.2d 162.

¶ 11. It has often been said that the goal of statutory interpretation "is to discern and give effect to the intent of the legislature." *State v. Morford,* 2004 WI

5, ¶ 21, 268 Wis. 2d 300, 674 N.W.2d 349. In *State ex rel. Kalal v. Circuit Court for Dane County,* 2004 WI 58, 271 Wis. 2d 633, 681 N.W.2d 110, the court recognized and discussed the tension between "legislative intent" and "statutory meaning" and acknowledged that "legislative intent" is sometimes at odds with a methodology that gives primacy to "intrinsic sources of statutory meaning." *Id.,* ¶ 43.

¶ 12. The debate over statutory interpretation will surely continue. But this court adheres to the proposition that statutory interpretation begins with the language of the statute, and if the meaning there is plain, the inquiry *ordinarily* ends. *Id.,* ¶ 45. In examining the statutory text, however, we emphasize that ascertaining plain meaning requires us to do more than focus on "a single, isolated sentence or portion of a sentence[.]" *Landis v. Physicians Ins. Co. of Wis., Inc.,* 2001 WI 86, ¶ 16, 245 Wis. 2d 1, 628 N.W.2d 893. We are expected to look to "the role of the relevant language in the entire statute." *Id.; see Wis. Citizens Concerned for Cranes & Doves v. DNR,* 2004 WI 40, ¶ 6, 270 Wis. 2d 318, 677 N.W.2d 612. Accordingly, we consider the context in which words appear, the structure of the statute, and the purpose of the statute where it is evident from the statutory text. *Kalal,* 271 Wis. 2d 633, ¶¶ 48, 49.

¶ 13. There are three situations in which the court looks outside the statute. First, if the meaning of a statute is ambiguous after considering all intrinsic sources, we look to extrinsic sources such as legislative history to find legislative intent. *Id.,* ¶ 50. This methodology is thoroughly familiar.

¶ 14. Second, if the meaning of the statute is plain, we sometimes look to legislative history to confirm the plain meaning. *Id.,* ¶ 51; *Seider v. O'Connell,* 2000 WI 76, ¶¶ 51–52, 236 Wis. 2d 211, 612 N.W.2d 659. Our purpose in doing this is merely to contribute to an informed explanation that will firm up statutory meaning.

¶ 15. Third, if the meaning of the statute appears to be plain but that meaning produces absurd results, we may also consult legislative history. The purpose in this situation is to verify that the legislature did not intend these unreasonable or unthinkable results. *See Green v. Bock Laundry Mach. Co,* 490 U.S. 504, 527 (1989) (Scalia, J., concurring);[6] *Kalal,* 271 Wis. 2d 633, ¶ 52 n.9; *see also Public Citizen v. United States Dep't of Justice,* 491 U.S. 440, 465 (1989) (invoking the Supreme Court's absurdity exception to the plain language of the statute); *Robbins v. Chronister,* 402 F.3d 1047, 1050 (10th Cir. 2005) (collecting federal circuit court and Supreme Court cases applying the absurdity exception). Because our purpose in these situations is grounded in open disbelief of what a statute appears to require, we are bound to limit our off-statute investigations to obvious aberrations.

---

[6] In *Green v. Bock Laundry Mach. Co.,* 490 U.S. 504, 527 (1989), Justice Scalia explained in his concurrence:

> I think it entirely appropriate to consult all public materials, including the background of [the federal rule of evidence in question] and the legislative history of its adoption, to verify that what seems to us an unthinkable disposition ... was indeed unthought of, and thus to justify a departure from ... the ordinary meaning of the word "defendant" in the Rule.

¶ 16. The parties sharply disagree over the meaning of Wis. Stat. § 632.32(5)(i)2. American Family contends that sub. (5)(i)2. is plain and unambiguous. American Family emphasizes that sub. (5)(i)2. allows a policy to reduce the limits for uninsured motorist coverage by "[a]mounts paid or payable under *any* worker's compensation law." (Emphasis added.) American Family asserts that because "any" worker's compensation law means "all" worker's compensation laws and because Wis. Stat. § 102.49(5)(b) is a worker's compensation law that requires worker's compensation benefits to be paid to the Fund, the statute permits uninsured motorist limits to be reduced by these payments. According to American Family, this is the only reasonable interpretation of sub. (5)(i)2., because the interpretation of the Shiras and the court of appeals requires the phrase "to the insured" to be read into the statute.

¶ 17. Conversely, the Shiras argue that Wis. Stat. § 632.32(5)(i)2. is ambiguous. The ambiguity arises, they contend, because the statute is silent as to whom the worker's compensation benefits must be paid before uninsured motorist limits may be reduced. The Shiras reason that sub. (5)(i)2. can mean that policy limits may be reduced when worker's compensation benefits are paid to either (1) anyone or (2) only an insured. The Shiras contend that because § 632.32(4) mandates uninsured motorist coverage for the protection of the insured, the more reasonable inference is that worker's compensation benefits must be paid to the insured before uninsured motorist limits may be reduced.

¶ 18. The court itself is divided as to whether the meaning of Wis. Stat. § 632.32(5)(i)2. is ambiguous or plain. In Part III.A., Justices Bradley, Prosser, and Roggensack analyze why the statute is ambiguous in

the context of the entire statutory scheme.[7] In Part III.B., Justices Wilcox, Crooks, and Butler analyze why the meaning of the statute is plain, but determine that the results that follow are so unreasonable or absurd that they require the plain meaning to be rejected.[8] Our divergent views on whether Wis. Stat. § 632.32(5)(i)2. is ambiguous do not prevent us from coming together in Part III.C. to examine legislative history, legislative purpose, and public policy to discern legislative intent. After examining both extrinsic and intrinsic sources, the court reaches the conclusion that Wis. Stat. § 632.32(5)(i)2. does not allow an insurer to reduce uninsured motorist coverage limits by worker's compensation payments made to the Fund.

A. Wis. Stat. § 632.32(5)(i)2. Is Ambiguous

¶ 19. A statute is not ambiguous simply because the parties, the circuit court, and the court of appeals disagree as to its meaning. *Bruno v. Milwaukee County,* 2003 WI 28, ¶¶ 18, 21, 260 Wis. 2d 633, 660 N.W.2d 656. Rather, a statute is ambiguous "if it is capable of being understood by reasonably well-informed persons in two or more senses." *Kalal,* 271 Wis. 2d 633, ¶ 47. Stated otherwise, a statute is ambiguous if the "statutory language *reasonably* gives rise to different meanings." *Id.* (ellipsis omitted). Though not dispositive, the fact that the circuit court and court of appeals reached contradictory interpretations, despite both courts concluding that the statute was clear, is indicative of

---

[7] Justices Bradley, Prosser, and Roggensack believe that the statute is ambiguous.

[8] Justices Wilcox, Crooks, and Butler believe that the meaning of the statute is plain, but the results produced by the plain meaning are absurd.

ambiguity. *See Stockbridge Sch. Dist. v. Dep't of Public Instruction Sch. Dist. Boundary Appeal Bd.*, 202 Wis. 2d 214, 222, 550 N.W.2d 96 (1996).

¶ 20. Several years ago, this court held that Wis. Stat. § 632.32(5)(i) was unambiguous, *see Dowhower v. West Bend Mutual Insurance Company*, 2000 WI 73, ¶ 17, 236 Wis. 2d 113, 613 N.W.2d 557, but that ruling was made in the context of a $25,000 payment *to the insured* from another insurance company. A statute that is unambiguous in one context may be ambiguous in another, *Landis v. Physicians Insurance Company of Wisconsin, Inc.*, 2001 WI 86, ¶ 15, 245 Wis. 2d 1, 628 N.W.2d 893; *Seider v. O'Connell*, 2000 WI 76, ¶ 43, 236 Wis. 2d 211, 612 N.W.2d 659, because words cannot anticipate every possible fact situation.

¶ 21. Sometimes, a statute is ambiguous based purely on its words. *State of Wis. Dep't of Corrections v. Schwarz*, 2005 WI 34, ¶ 14, 279 Wis. 2d 223, 693 N.W.2d 703. At other times, ambiguity arises from "the words of the provision as they interact with and relate to other provisions in the statute[.]" *Id.* Justices Bradley, Prosser, and Roggensack think this case presents the latter scenario and agree with the Shiras that Wis. Stat. § 632.32(5)(i)2. is reasonably susceptible to two different meanings.[9]

¶ 22. The literal reading of Wis. Stat. § 632.32(5)(i)2. favored by American Family permits the conclusion that an insurer may reduce uninsured motor-

---

[9] The three justices who think the statute is ambiguous are not oblivious to the absurd consequences that would follow the application of a plain reading of the statute. These consequences might render a plausible interpretation of the statute an unreasonable interpretation of the statute.

138

ist limits by the amount of worker's compensation payments made to anyone. Subsection (5)(i)2. contains no qualifying language specifying to whom the payments must be made; payments could be made to the insured, to the Fund, or to anyone.

¶ 23. On the other hand, when sub. (5)(i)2. is considered in the broader context of § 632.32(4) and (5) —which demonstrate an overarching purpose to protect Wisconsin citizens by requiring uninsured motorist coverage—one is inclined to believe that there is an implicit condition that the insurer may reduce uninsured motorist benefits only by the amount of worker's compensation payments made to or on behalf of the insured.

¶ 24. The reason to doubt a literal meaning of § 632.32(5)(i)2. is that it clashes with related statutes. Wisconsin Stat. § 632.32(4) requires that every motor vehicle insurance policy include uninsured motorist coverage. *Clark v. Am. Family Mut. Ins. Co.*, 218 Wis. 2d 169, 173, 577 N.W.2d 790 (1998). The purpose of uninsured motorist coverage is explained in the text of sub. (4). The purpose is to protect "persons injured who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including *death* resulting therefrom[.]" § 632.32(4) (emphasis added). Uninsured motorist coverage seeks "to compensate an insured who is the victim of an uninsured motorist's negligence to the same extent as if the uninsured motorist were insured." *E.g., Hull v. State Farm Mut. Auto. Ins. Co.*, 222 Wis. 2d 627, 644, 586 N.W.2d 863 (1998) (quoting *Clark,* 218 Wis. 2d at 178) (internal quotation marks omitted). In other words, uninsured motorist coverage "substitutes for insurance that the tortfeasor should have had." *Id.* at 644–45.

¶ 25. To promote this objective, uninsured motorist coverage is personal and portable. *St. Paul Mercury Ins. Co. v. Zastrow,* 166 Wis. 2d 423, 435, 437, 480 N.W.2d 8 (1992) (superseded by statute on other grounds). The insured purchases uninsured motorist coverage for his own benefit and protection and it follows him wherever he may go, be it "in an unowned vehicle, on a motorcycle, on a bicycle, whether afoot or on horseback or even on a pogo stick." *Welch v. State Farm Mut. Auto. Ins. Co.,* 122 Wis. 2d 172, 181, 361 N.W.2d 680 (1985) (superseded by statute on other grounds). Thus, the purpose of uninsured motorist coverage, expressly stated in Wis. Stat. § 632.32(4)(a), is to protect insureds injured in motor vehicle accidents.

¶ 26. In 1995 the legislature authorized reducing clauses in 1995 Wis. Act 21. This legislation permitted insurers to offer a particular type of uninsured and underinsured motorist coverage. *See Dowhower,* 236 Wis. 2d 113. This type of coverage had the effect of reducing the total amount available to compensate an injured insured, but by limiting the insurer's exposure, it helped keep uninsured motorist premiums affordable and encouraged insureds to purchase a predetermined, fixed level of insurance coverage they thought they needed rather than having to rely on the unpredictable liability coverage of tortfeasors.

¶ 27. Wisconsin Stat. § 632.32(5)(i) reflects a tension between assuring a predetermined, fixed level of insurance coverage and minimizing the exposure of insurers. When confronted with dueling statutory pur poses, the court must attempt to harmonize them, if possible, so as to give effect to both purposes, while

140

advancing the leading purpose underlying the law. *See Schwarz,* 279 Wis. 2d 223, ¶ 28; *Beard v. Lee Enter., Inc.,* 225 Wis. 2d 1, 15, 591 N.W.2d 156 (1999). The consistent leading purpose of this statutory scheme is to require that insurers provide uninsured motorist coverage for the protection of their insureds, Wis. Stat. § 632.32(4); the subordinate purpose is to minimize the insurers' exposure by allowing insurers to limit the protection offered by uninsured motorist coverage to a fixed, predetermined amount that takes into account payments from specified sources, § 632.32(5)(i).

¶ 28. Though sub. (5)(i) reduces the protection afforded insureds by uninsured motorist coverage, it does not nullify that protection altogether. American Family's literal interpretation could defeat the purpose of sub. (4) by allowing insureds to be left without any uninsured motorist coverage despite having paid premiums for it. Allowing American Family to reduce its uninsured motorist limits by amounts paid by a worker's compensation carrier *to the Fund* would deny Scott and his parents a predetermined, fixed level of coverage, in contravention of the underlying statutory purpose.

¶ 29. In view of this conflict, Justices Bradley, Prosser, and Roggensack conclude that Wis. Stat. § 632.32(5)(i)2. is ambiguous, and examine legislative history and public policy in Part III.C. to determine which of the two interpretations is more reasonable. *See Kalal,* 271 Wis. 2d 633, ¶ 50.

B. The Meaning of Wis. Stat. § 632.32(5)(i)2. Is Plain but Leads to Absurd Results

¶ 30. An alternative interpretation, which Justices Wilcox, Crooks, and Butler favor, may be stated as follows: There is no ambiguity in Wis. Stat. § 632.32(5)(i)2. The statute says that policy limits may

be reduced by "amounts paid or payable under any worker's compensation law." The clause "amounts paid or payable" is not qualified and unambiguously brings within its scope payments made to the insured or to any other person or entity, provided that the payment was made under any worker's compensation law.

¶ 31. The parties agree that Scott's worker's compensation insurance death benefit was paid to the Fund "under the worker's compensation law," Wis. Stat. § 102.49(5)(b). They dispute, however, whether the phrase "amounts paid or payable" should be qualified by the words "to the insured," as the Shiras argue. Since that limiting qualifier is not present in the text of the statute, the plain meaning of § 632.32(5)(i)2. allows policy limits to be reduced regardless of to whom worker's compensation payments are made. Therefore, American Family is correct that the words of the statute are clear and do not reasonably give rise to different meanings. *See Kalal,* 271 Wis. 2d 633, ¶ 47.

¶ 32. Although the meaning of the statute appears to be plain, a literal application of the language would be absurd. As a general rule, courts apply the ordinary and accepted meaning of statutory language, unless it produces an absurd result. *Seider,* 236 Wis. 2d 211, ¶ 32. Because a literal application of Wis. Stat. § 632.32(5)(i)2. would produce an absurd and unreasonable result in certain situations, Justices Wilcox, Crooks, and Butler construe the statute to avoid that result. *State v. Delaney,* 2003 WI 9, ¶ 15, 259 Wis.2d 77, 658 N.W.2d 416.

¶ 33. To understand the absurdity that flows from an interpretation that would allow policy limits to be reduced by payments to the Fund, some background on the Wisconsin Worker's Compensation Act (WCA) is necessary.

¶ 34. The Fund creates a source of worker's compensation benefits for certain cases in addition to the benefits the WCA requires an employer or worker's compensation carrier to pay to an employee who is injured or who dies in the course of his employment. *See* Wis. Stat. §§ 102.44, 102.47, 102.49, 102.59, 102.65, and 102.66. For example, the Fund distributes (1) worker's compensation benefits to claimants with certain meritorious claims whose claims have become time-barred, § 102.66(1); and (2) an additional death benefit to the minor children of an employee who dies in the course of employment, § 102.49(1).

¶ 35. The Fund is financed by payments from employers or worker's compensation carriers. The payments are required anytime certain specified workplace injuries occur. Wis. Stat. §§ 102.49(5) and 102.59(2). For example, payments must be made to the Fund (1) anytime an employee dies while in the course of employment, § 102.49(5)(a) ($5000 payment);[10] (2) anytime an employee dies in the course of employment and leaves no dependents, § 102.49(5)(b) (the entire amount of the death benefit); (3) anytime an employee dies and is survived by partial dependents, § 102.49(5)(c) (the difference between the death benefit to a wholly dependent survivor and a partially dependent survivor); and (4) anytime an employee suffers "the total impairment of a hand, arm, foot, leg or eye," § 102.59(2) ($7000 payment).[11]

---

[10] This amount is increased to $10,000 in the 2003–04 Wisconsin Statutes. 2005 Wisconsin Act 172 increases the amount to $20,000.

[11] This amount is increased to $10,000 in the 2003–04 Wisconsin Statutes. 2005 Wisconsin Act 172 increases the amount to $20,000.

¶ 36. The Fund reflects a legislatively crafted scheme to impose additional burdens upon employers or worker's compensation carriers when certain workplace injuries occur and to withhold death benefits from employees who die without dependents, so that this money can be used to pay dependent children of deceased employees and injured employees who would otherwise be undercompensated.

¶ 37. The administration of the Fund is consistent with the overall purpose of the WCA. The fundamental purpose of the WCA is to compensate injured employees. *State v. LIRC,* 136 Wis. 2d 281, 288, 401 N.W.2d 585 (1987); *Duvick v. Indus. Comm'n of Wis.,* 22 Wis. 2d 155, 161, 125 N.W.2d 356 (1963). The WCA ensures employees "smaller but more certain recoveries than might be available in tort actions, while employers are freed from the risk of large and unpredictable damage awards." *Byers v. LIRC,* 208 Wis. 2d 388, 396, 561 N.W.2d 678 (1997). Accordingly, the WCA balances the interests of employers and employees by ensuring a recovery sufficient to meet an employee's economic damages while keeping the expense of funding worker's compensation manageable for employers.

¶ 38. Insofar as tort law and uninsured motorist coverage compensate an injured person for his or her *economic* damages, they overlap the WCA. Accordingly, in the majority of cases, the legislature's decision to link the operation of uninsured motorist reducing clauses to recovery of worker's compensation benefits has the reasonable purpose of preventing double recovery. However, when payments are made to the Fund instead of a deceased employee, there cannot be double recovery. It is hard to think of a reason for allowing uninsured motorist limits to be reduced by worker's compensation

benefits paid to the Fund that is consistent with the purposes of the WCA and uninsured motorist coverage, both of which seek to protect injured persons.

¶ 39. The absurdity that results from American Family's interpretation of the statute is evident in the following examples. Many of the employees who die from an employment-related injury involving an uninsured or underinsured motor vehicle will have uninsured motorist and underinsured motorist coverage. In *every* case in which a worker's compensation death benefit is available for the employee's death, uninsured and underinsured motorist policy limits would be reduced by the amount of the death benefit actually received by the employee's dependents or by the amount deposited with the Fund, *plus* $5000 (now, $20,000). According to the logic of American Family's position, coverage limits would be reduced by $5000 (now, $20,000) in every case, regardless of whether a decedent's dependents were made whole. *See* Wis. Stat. § 102.49(5)(a). Thus, a reduction of $5000 (now $20,000) would mean that even when an insured's damages exceed his or her uninsured or underinsured motorist limits, the amount actually recovered from all sources would *never* equal the limits of his uninsured or underinsured motorist coverage. There is no plausible reason why the legislature would have denied dependents this money.

¶ 40. Similarly absurd is the suggestion that the legislature intended to reduce by $7000 (now, $20,000) the uninsured motorist and underinsured motorist limits available to an insured who has lost an arm, leg, or eye. *See* Wis. Stat. § 102.59(2). At least three members of the court cannot imagine that in situations where an insured has already suffered the loss of a limb or an eye in an automobile accident, the legislature intended to

permit insurers to impose a second loss of $7000 (now, $20,000) upon the insured in the form of reduced uninsured motorist coverage.

¶ 41. Other results of American Family's interpretation illustrate its absurdity. Wisconsin Stat. § 632.32(4)(a) requires insurers to provide uninsured motorist coverage "in limits of at least $25,000 per person" "[f]or the protection of persons injured[.]" Since the enactment of 2005 Wisconsin Act 172, which increases the amount of payments to the Fund to $20,000 for the loss of a limb or an eye, a literal interpretation of § 632.32(5)(i)2. would mean that the legislature had rendered the protection afforded by § 632.32(4)(a) virtually illusory in some circumstances.

¶ 42. Moreover, an insured's recovery under his uninsured motorist coverage would depend entirely on fate. That is, if the insured were driving down a local highway on Wednesday morning during the course of his employment, he would receive $20,000 less for losing a leg when he was hit by an uninsured motor vehicle than if he had suffered the same injury on Sunday coming home from church. This result is contrary to our holding that uninsured and underinsured motorist coverage provides a predetermined, fixed level of coverage. *See Welin v. Am. Family Ins. Co.*, 2006 WI 81, ¶¶ 46, 49–53, 292 Wis.2d 73, 717 N.W.2d 690 (discussing cases).[12]

---

[12] This conclusion is consistent with our decision in *Welin v. American Family Insurance Company*, 2006 WI 81, ¶ 8, 292 Wis.2d 73, 717 N.W.2d 690. In *Welin* we held that an insurer could not reduce the limits of an underinsured motorist policy pursuant to Wis. Stat. § 632.32(5)(i)1. without regard to the amount the injured person actually received from the tortfeasor's insurer. *Id.* In reaching this conclusion, we explained that the underlying purpose of the underinsured mo-

¶ 43. These are some of the absurd results of a literal interpretation of Wis. Stat. § 632.32(5)(i)2. Because this literal interpretation produces absurd results and defies both common sense and the fundamental purpose of the WCA and uninsured motorist coverage, Justices Wilcox, Crooks, and Butler reject it unless extrinsic sources reveal the legislature intended these consequences. *See Green,* 490 U.S. at 527 (Scalia, J., concurring).

## C. Legislative History and Public Policy

¶ 44. Upon review of legislative history and public policy, the court concludes that the more reasonable interpretation of the statute is that payments to the Fund cannot reduce uninsured motorist coverage limits. As we see it, the statute authorizes reductions in coverage limits by the total amount of worker's compensation payments made to or on behalf of the insured, the insured's heirs, or the insured's estate.

### 1. Legislative History

¶ 45. We return to history. Uninsured motorist coverage dates back to the mid-1950s. Helen Freedman, *Uninsured Motorist Developments in Wisconsin,* 30 The Gavel 3 (Dec. 1969). The legislature first required insurers to offer this coverage beginning in 1966. See Wis. Stat. § 204.30(5) (1967–68) (created by ch. 486, Laws of 1965).

---

torist statute, § 632.32(4m), is to ensure that insureds receive "a predetermined, fixed level of coverage for an accident from a combination of the tortfeasor's insurance and the UIM insurance." *Id.,* ¶ 52.

¶ 46. Reducing clauses have been part of the insurance landscape during most of this period. *Nicholson v. Home Insurance Company,* 137 Wis. 2d 581, 594–601, 405 N.W.2d 327 (1987), contains a thorough history of reducing clauses up to 1987. We will not repeat that history in its entirety, but merely summarize the essentials to lay the groundwork for the developments since *Nicholson.*

¶ 47. The take-away points from *Nicholson* are as follows. Before the legislature made uninsured motorist coverage mandatory in 1971, this court upheld reducing clauses that reduced uninsured motorist limits by amounts the insured received from any other source. *E.g., Scherr v. Drobac,* 53 Wis. 2d 308, 310–11, 193 N.W.2d 14 (1972); *Leatherman v. Am. Family Mut. Ins. Co.,* 52 Wis. 2d 644, 650–51, 190 N.W.2d 904 (1971). In response to *Drobac* and *Leatherman,* the legislature prohibited reducing clauses. *See* ch. 72, Laws of 1973 (then-codified at Wis. Stat. § 204.30(5)(a) (1973–74)). Then the legislature amended § 204.30(5)(a) (1973–74) and renumbered it as Wis. Stat. § 632.32(3)(a) (1975–76) in 1975. *See* ch. 375, Laws of 1975. This legislation removed the express prohibition on reducing clauses enacted in 1973 without actually approving their use. *Nicholson,* 137 Wis. 2d at 599; *see also* Legislative Council Committee Comment to § 632.32 ch. 375, Laws of 1975. In 1987 this court refused to enforce reducing clauses because, we said, they would thwart the purpose of uninsured motorist coverage "of placing the injured party in the same position that she would have been in had the uninsured motorist been insured[.]" *Nicholson,* 137 Wis. 2d at 592.

¶ 48. Thereafter, until 1995 Wisconsin Act 21, this court consistently struck down reducing clauses as contrary to the requirement that motor vehicle insur-

ance policies include uninsured motorist coverage. *E.g.,* *Kuhn v. Allstate Ins. Co.,* 193 Wis. 2d 50, 61, 532 N.W.2d 124 (1995); *United Fire & Cas. Co. v. Kleppe,* 174 Wis. 2d 637, 643, 498 N.W.2d 226 (1993). A review of these cases demonstrates that since the first case to review an uninsured motorist reducing clause, *Leatherman,* 52 Wis. 2d 644, in every case the insurer has attempted to reduce uninsured motorist limits because of a payment to the insured. Of particular relevance to this case is *Kleppe,* in which we held unenforceable a reducing clause that would have reduced uninsured motorist limits by the amount of worker's compensation benefits received by the plaintiff. *Kleppe,* 174 Wis. 2d at 643. In *Kleppe,* we based our decision on the fact that enforcing the reducing clause would have left the plaintiff worse off than if the uninsured motorist had been insured. *Id.*

¶ 49. 1995 Wisconsin Act 21 was intended to overturn the *Nicholson/Kleppe* line of cases that refused to enforce reducing clauses in the context of uninsured motorist coverage. The analysis from the Legislative Reference Bureau stated:

> The bill also permits motor vehicle insurance policies to reduce the limits payable under the policy for uninsured and underinsured motorist coverage by payments received from other sources. Payments for bodily injury or death may be reduced . . . by amounts paid or payable under a worker's compensation law . . . .

*See* 1995 Senate Bill 6, Analysis by the Legislative Reference Bureau (discussing proposed Wis. Stat. § 632.32(5)(i)).

¶ 50. The source of 1995 Wisconsin Act 21 was 1995 Senate Bill 6. 1995 Senate Bill 6 was introduced by Senator Joanne Huelsman. It was based in part on her 1993 Senate Bill 135. Senator Huelsman sent an early

draft of the 1993 bill to the Wisconsin Insurance Alliance for comment. The Insurance Alliance replied in a letter dated January 12, 1993, from its president, Eric Englund. Englund wrote:

(1) *Amendments to Draft:* We would like to amend the draft to include a provision permitting insurers to include language in their policies that would reduce the underinsured (UIM) limit shown in the policy by the total amount of other limits providing coverage to the owner of the underinsured vehicle. 1991 SB 105 did not include similar language. We suggest language inserted as subsec. (h) and reading as follows:

(h) Notwithstanding s. 631.43(1), a policy may provide that the limit under the policy for underinsured motorist coverage for bodily injury or death resulting from any one accident will be reduced by all of the following:

1. Amounts paid by or on behalf of persons or organizations who may be legally responsible.

2. Amounts paid or payable under any worker's compensation law.

3. Amounts paid or payable under any disability benefits laws.

¶ 51. It should be noted that Englund's letter makes reference only to reductions in *underinsured* motorist coverage. Reductions in uninsured motorist coverage came in a later draft. Englund's letter also references Wis. Stat. § 631.43(1) (1991–92), which at that time read in part:

When 2 or more policies promise to indemnify an insured against the same loss, no "other insurance" provisions of the policy may . reduce the aggregate protection of the insured below the lesser of the actual

150

insured loss suffered by the insured or the total indem-
nification promised by the policies if there were no
"other insurance" provisions. The policies may by their
terms define the extent to which each is primary and
each excess, but if the policies contain inconsistent
terms on that point, the insurers shall be jointly and
severally liable to the insured on any coverage where
the terms are inconsistent, each to the full amount of
the coverage provided.

¶ 52. Current Wis. Stat. § 631.43(3) provides:
"Subsection 1 does not affect the rights of insurers to
exclude, limit or reduce coverage under s. 632.32(5)(b),
(e), or (f) to (j)." This includes paragraph (i).

¶ 53. Despite having added "uninsured" motorist
coverage to the proposal suggested by the Wisconsin
Insurance Alliance, having changed the word "limit" to
"limits," having changed the text of § 632.32(5)(i)1., and
having excepted the application of § 631.43(1) to
§ 632.32(5)(i), Senator Huelsman still submitted legis-
lation, in two consecutive sessions, with an analysis
that used the phrase "reduce the limits payable under
the policy . . . by payments *received* from other sources."
(Emphasis added.) In addition, paragraph (i) contains
language *not* suggested by the Insurance Alliance: "A
policy may provide that the limits . . . shall be reduced
by any of the following *that apply:* . . . ." The words "that
apply" are a protection against payments that do not
apply and thus do not reduce coverage.

¶ 54. Nothing in the legislative history demon-
strates that the legislature contemplated or intended
that uninsured motorist limits should be reduced by
payments to an entity unrelated to the insured (except
a provider such as a hospital which stands in the place
of the insured). Often, silence in legislative history is
merely the result of an incomplete record, and there-

151

fore, not meaningful. Where, however, a party proffers an interpretation that marks a radical departure from prior law or produces an unusual, counter-intuitive, or unreasonable result, silence can be significant. *See Strenke v. Hogner,* 2005 WI 25, ¶ 50, 279 Wis. 2d 52, 694 N.W.2d 296. American Family's interpretation would constitute a marked departure from prior law and would produce absurd results.

¶ 55. Prior to 1995—indeed prior to this very case—no Wisconsin case discussed the possibility that uninsured motorist limits could be reduced by payment of worker's compensation benefits to unrelated third parties such as the Fund. Moreover, in none of the leading treatises on uninsured motorist and underinsured motorist insurance is there even a hint that uninsured motorist limits could be reduced by worker's compensation payments made to anyone other than the insured or to someone on behalf of the insured, the insured's heirs, or the insured's estate. *See generally,* 2 Irvin Schermer & William Schermer, *Automobile Liability Insurance* §§ 28:3 to 28:8 (4th ed. 2004); 1 Alan Widiss, *Uninsured and Underinsured Motorist Insurance* §§ 14.3, 41.10 (Revised 2nd ed. 1999); 3 Matthew Bender & Co., Inc., *No-Fault and Uninsured Motorist Automobile Insurance* § 31.20 (2003); 12 Lee Russ & Thomas Segalla, *Couch on Insurance* §§ 171:37 to 171:43. Rather, a review of these treatises reveals that the application of a setoff or reducing clause presumes some payment to the insured, which in turn reduces the amount of uninsured motorist benefits owed to the insured. Because the result proposed by American Family is not suggested by any case or secondary source that we have been able to find, and because American Family has not directed our attention to any such

source, we think it extraordinarily unlikely that the legislature contemplated the result sought by the insurer.

¶ 56. We are mindful of the instruction that a court should consider the "mischief sought to be remedied" by a statute when interpreting the statute. *See Heyde Co., Inc. v. Dove Healthcare, LLC,* 2002 WI 131, ¶ 15 n.3, 258 Wis. 2d 28, 654 N.W.2d 830. We think it telling that 1995 Wisconsin Act 21 was intended to "remedy" the refusal of Wisconsin courts to allow insurers to reduce uninsured motorist limits by *amounts received by an injured person* from other sources. *See Kleppe,* 174 Wis. 2d at 642. We think the legislature responded to a discrete series of cases and did not intend to permit insurers to reduce uninsured motorist limits by worker's compensation benefits paid to the Fund.

¶ 57. This result is completely harmonious with the legislative goal that all motor vehicle policies include uninsured motorist coverage to protect persons injured in automobile accidents "who are legally entitled to recover damages from owners or operators of uninsured motor vehicles."

## 2. Public Policy of the Worker's Compensation Statutes

¶ 58. American Family argues that allowing insurers to reduce uninsured motorist limits in this situation is consistent with the public policy reflected in Wis. Stat. Chapter 102 ("Worker's Compensation"). According to American Family, Chapter 102 embodies a policy of denying recovery to claimants whose relationships to an injured person are remote. American Family notes this policy decision is embodied in Wis. Stat.

§§ 102.48, 102.49, and 102.51, which limit a death benefit to dependents of the deceased. Therefore, American Family concludes, it is reasonable that the legislature would have intended that people like the Shiras, who were not financially dependent upon Scott, be denied uninsured motorist coverage.

¶ 59. While American Family is correct that the Shiras do not qualify as dependents under the WCA, the policies underlying the WCA and tort law differ. The WCA reflects a decision to limit the amounts recovered by injured employees to avoid imposing burdensome expenses upon employers. *See Threshermens Mut. Ins. Co. v. Gross,* 217 Wis. 2d 451, 459–60, 577 N.W.2d 335 (1998) (explaining the compromise reached by the legislature to balance the interests of employers and employees); *id.* at 483 (Bradley, J., dissenting) (recounting the history of the compromise). The WCA ensures a minimal safety net for those financially dependent upon a deceased or injured employee by causing an employee to relinquish all common law remedies in exchange for the abrogation of the employer's defenses. *See Gross,* 217 Wis. 2d at 460, 469 n.7.[13]

---

[13] Although *Gross* recognized that pain and suffering is a factor in the determination of the level of disability in a WCA award, it did not impose any new liability on the employer or insurer for damages for general pain and suffering. *Threshermens Mut. Ins. Co. v. Gross,* 217 Wis. 2d 451, 460, 577 N.W.2d 335 (1998). Furthermore, the primary holding of the case (allowing employers or insurers to make claims against a third party for pain and suffering sustained by the injured party) did not change the relevant fundamental feature of the WCA: injured employees cannot make claims against their employer for pain and suffering that does not interfere with earning capacity. *Id.* at 469 n.7.

¶ 60. Tort law offers more than a minimal financial safety net. The purpose of tort law is to make an injured person whole. Though an insurer's potential obligation to pay under an uninsured motorist policy arises by contract, the insured's actual recovery is affected by common law remedies and common law defenses applicable in a tort action for negligence. *See State Farm Mut. Auto. Ins. Co. v. Gillette*, 2002 WI 31, ¶¶ 43–48, 68, 251 Wis. 2d 561, 641 N.W.2d 662. The legislature has not imposed a compromise between insureds and uninsured motorist insurers that limits the recovery of insureds in exchange for depriving insurers of common law defenses available to tortfeasors. *Cf. id.*, ¶ 68. Accordingly, we conclude the policy considerations at play in the WCA are not present here and do not preclude the Shiras from recovering under Scott's policy.

¶ 61. In addition, American Family suggests that our decision should adhere to the analysis in *Seider*. In *Seider* we considered whether the Office of the Commissioner of Insurance (OCI) exceeded its authority in adopting an administrative rule interpreting the valued policy law, Wis. Stat. § 632.05(2). The valued policy law provides that anytime "real property that is owned and occupied by the insured primarily as a dwelling is wholly destroyed, . . . the amount of the loss shall be taken conclusively to be the policy limits of the policy insuring the property." § 632.05(2). The OCI promulgated an administrative rule that defined "dwelling" to *exclude* "real property any part of which is used for commercial (non-dwelling) purposes other than on an incidental basis . . . ." Wis. Admin. Code § INS 4.01(2)(e) (June, 1999). We invalidated the administrative rule because its restrictive definition of dwelling

contradicted the plain and unambiguous meaning of "dwelling" in § 632.05(2). *Seider*, 236 Wis. 2d 211, ¶ 6.

¶ 62. *Seider* does not control this case. Unlike in *Seider*, where the statute was unambiguous, Wis. Stat. § 632.32(5)(i)2. is either ambiguous when applied to the facts of this case or its plain meaning produces absurd results. Hence, this court has a duty to clarify the ambiguity or look beyond the plain meaning and state definitively what the law is.

## IV. CONCLUSION

¶ 63. We conclude that Wis. Stat. § 632.32(5)(i)2. does not allow an insurer to reduce uninsured motorist policy limits by worker's compensation payments that are not made to or on the behalf of the insured, the insured's heirs, or the insured's estate. Accordingly, we affirm the court of appeals and hold that American Family cannot reduce its uninsured motorist policy limits by worker's compensation payments made to the Fund.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 64. SHIRLEY S. ABRAHAMSON, C.J. (*concurring*). I agree with the majority opinion that under Wis. Stat. § 632.32(5)(i)2., uninsured motorist policy limits may not be reduced by worker's compensation payments that are not made to or on behalf of the insured, the insured's heirs, or the insured's estate.[1]

¶ 65. I write separately to point out that the majority opinion demonstrates the futility of labeling a statute as ambiguous or unambiguous as a means of statutory interpretation instead of just determining what a statute means.

[1] Majority op., ¶ 2.

156

¶ 66. The majority opinion states that Justices Ann Walsh Bradley, David T. Prosser, and Patience D. Roggensack conclude that Wis. Stat. § 632.32(5)(i)2. is ambiguous and that Justices Jon P. Wilcox, N. Patrick Crooks, and Louis B. Butler conclude that the statute is unambiguous.[2] I join neither camp.

¶ 67. This opinion demonstrates what I have written numerous times: The ambiguous/unambiguous, literal, plain meaning debate is a word game. The characterizations of "ambiguous," "unambiguous," "literal," and "plain meaning" are in the eyes of the beholder and appear to be conclusory labels a court pins on a statute.[3]

---

[2] Majority op., ¶ 18, n.7, 8.

[3] *See, e.g., State ex rel. Kalal v. Circuit Court for Dane County,* 2004 WI 58, ¶ 63, 271 Wis. 2d 633, 681 N.W.2d 110 (Abrahamson, C.J., concurring) ("I have criticized this approach to plain meaning, ambiguity, and legislative history before. Language is often ambiguous; the distinction between 'plain' and 'ambiguous' is in the eye of the beholder; and both words too often are conclusory labels a court pins on a statute, making its decision appear result-oriented." (footnotes omitted)); *State v. Peters,* 2003 WI 88, ¶ 28, 263 Wis. 2d 475, 665 N.W.2d 171 (Abrahamson, C.J., concurring) (discussing fact that when the court determines a statute is unambiguous, it will use some canons of statutory construction, but not others); *id.,* ¶ 40 (Bablitch, J., concurring) ("What is plain to one may be ambiguous to another. If good evidence as to legislative intent is present, why not use it?"); *Fox v. Catholic Knights Ins. Soc'y,* 2003 WI 87, ¶ 43, 263 Wis. 2d 207, 655 N.W.2d 181 (Abrahamson, C.J., concurring) ("[T]his is another case in which the court mouths the exclusive plain meaning rule and then properly looks beyond the 'plain language' of the statute without finding that the statutory language is ambiguous." (footnote omitted)); *id.,* ¶ 53 (Bablitch, J., concurring) (advocating the use of any useful and available information regarding legislative intent); *State v. Byers,* 2003 WI 86, ¶¶ 46–47, 263 Wis.2d 113, 665 N.W.2d 729 (Abrahamson, C.J., concurring) ("Even a casual

¶ 68. The majority opinion explains on the one hand that "a statute is ambiguous 'if it is capable of

observer of the Wisconsin cases would, without fear of being contradicted, summarize the case law as adopting inconsistent approaches to statutory interpretation."); *State v. Delaney,* 2003 WI 9, ¶ 38, 259 Wis. 2d 77, 658 N.W.2d 416 (Abrahamson, C.J., dissenting) ("Rules of statutory interpretation are designed to help courts discern the intent of the legislature, not to serve as blinders. In this case, the majority opinion uses the plain language rule to shield its eyes from the legislative intent to exclude motor vehicle offenses from consideration both as a predicate offense and a present offense under the habitual offender statute."); *State v. Sample,* 215 Wis. 2d 487, 510, 573 N.W.2d 187 (1998) (Abrahamson, C.J., concurring) (advocating a holistic approach to statutory interpretation and observing that "[b]y using this approach to statutory interpretation, judges can acknowledge and deal with interpretive problems that arise from the inherent ambiguity of language as well as the limits of our linguistic capabilities."); *City of Madison v. Town of Fitchburg,* 112 Wis. 2d 224, 236, 332 N.W.2d 782 (1983) ("This court has consistently stated that the spirit or intention of a statute should govern over the literal or technical meaning of the language used."); *City of Madison v. Town of Fitchburg,* 112 Wis. 2d 224, 244, 332 N.W.2d 782 (1983) (Abrahamson, J., dissenting) ("[T]his court may, contrary to the plain meaning rule, look outside the statute to see if there is persuasive evidence of a clear legislative intention different from that to which an ordinary reading of the plain words of the statute would lead . . . ."); *see also* Ronald Dworkin, *Law's Empire* (1986) (focusing on the entire history of a statute and how it fits into the current legislative scheme); Richard A. Posner, *The Problems of Jurisprudence* (1990) (placing weight on the pre-enactment history of a statute); William N. Eskridge, Jr. & Philip P. Frickey, *Statutory Interpretation as Practical Reasoning,* 42 Stan. L. Rev. 321 (1990) (urging consideration of a broad range of textual, historical, and other evidence in interpreting statutes); Richard A. Posner, *Statutory Interpretation—in the Classroom and in the Courtroom,* 50 U. Chi. L. Rev. 800, 816–17 (1983) ("By making statutory interpretation seem mechanical

being understood by reasonably well-informed persons in two or more senses.' "[4] On the other hand, the majority opinion also explains that a "statute is not ambiguous simply because the parties, the circuit court, and the court of appeals disagree as to its meaning."[5] What the opinion does not tell us is which members of the court of appeals or this court are not "reasonably well-informed persons"?[6]

¶ 69. Furthermore, this court (or a justice) has often stated that the consequences of an interpretation of a statute should not be considered. On the other hand, the court (or a justice) has stated that the consequences of an interpretation should be considered.[7] In the instant case, the ambiguous and unam-

rather than creative, the canons conceal, often from the reader of the judicial opinion and sometimes from the writer, the extent to which the judge is making new law in the guise of interpreting a statute or a constitutional provision.").

[4] Majority op., ¶ 19 (quoting *State ex rel. Kalal v. Circuit Court for Dane County,* 2004 WI 58, ¶ 47, 271 Wis. 2d 633, 681 N.W.2d 110).

[5] *Id.* (citing *Bruno v. Milwaukee County,* 2003 WI 28, ¶¶ 18, 21, 260 Wis. 2d 633, 660 N.W.2d 656).

[6] For various statements of a reasonable interpretation of a statute or an interpretation of a statute by a reasonably well-informed person, see, *e.g., Bruno v. Milwaukee County,* 2003 WI 28, ¶ 22, 260 Wis. 2d 633, 660 N.W.2d 656; *id.,* ¶¶ 31–32 (Bradley, J., concurring); *State v. Delaney,* 2003 WI 9, ¶ 14, 259 Wis. 2d 77, 658 N.W.2d 416.

[7] *State v. Hayes,* 2004 WI 80, ¶ 16, 273 Wis. 2d 1, 681 N.W.2d 203 ("Additional sources of legislative intent such as the context, history, scope, and objective of the statute, including the consequences of alternative interpretations, illuminate the intent of the legislature."); *id.,* ¶ 112 n.2 (Sykes, J., dissenting) ("[T]he majority appears to be endorsing the concept that statutory interpretation involves a judicial policy judgment

biguous analyses in the majority opinion rely heavily on the fact that the result (i.e., consequence) of interpreting the statute to allow the reduction of underinsured motorist coverage by amounts paid into the Fund would produce an absurd result. Indeed, regardless of what we

based upon a weighing and balancing of competing "purposes and consequences" of alternative interpretations. This leaves room for the substitution of the judiciary's subjective policy choices for those of the legislature, a phenomenon that a text-based, plain-meaning approach to statutory interpretation seeks to guard against."); *State ex rel. Kalal v. Circuit Court for Dane County,* 2004 WI 58, ¶ 59, 271 Wis. 2d 633, 681 N.W.2d 110 (Abrahamson, C.J., concurring) ("[The majority opinion] recognizes that the purposes of the legislation should be considered in interpretation but refuses to consider the consequences of different interpretations as an aid to interpretation (but does consider the consequences right in this opinion)."); *Panzer v. Doyle,* 2004 WI 52, ¶¶ 39–40, 271 Wis. 2d 295, 680 N.W.2d 666 (after noting economic consequences suggested in amicus brief, stating that "[t]his court does not decide cases on these grounds," but further stating that "[t]his is not to say that the legal and practical consequences of our opinions are not considered."); *Tietsworth v. Harley-Davidson, Inc.,* 2004 WI 32, ¶ 79, 270 Wis. 2d 146, 677 N.W.2d 233 (Abrahamson, C.J., dissenting) ("[A] court must ascertain the legislative intent from the language of the statute in relation to its context, history, scope, and objective, including the consequences of alternative interpretations."); *State v. Byers,* 2003 WI 86, ¶ 56, 263 Wis. 2d 113, 655 N.W.2d 729 (Abrahamson, C.J., concurring) (quoting *Harrington v. Smith,* 28 Wis. 43, 59 (1871)); *Harrington v. Smith,* 28 Wis. 43, 59 (1871) ("[T]he true rule for the construction of statutes is, to look to the whole and every part of the statute, and the apparent intention derived from the whole, to the subject matter, to the effects and consequences, and to the reason and spirit of the law; and thus, to ascertain the true meaning of the legislature, though the meaning so ascertained may sometimes conflict with the literal sense of the words.").

160

may have said in the past, there can be no question that this majority opinion *does* consider the consequences of alternative statutory interpretations to determine the reasonable interpretation of the statute.

¶ 70. A better approach to statutory interpretation would be to drop the ambiguous/unambiguous/literal/plain meaning pretense and instead take a comprehensive view of statutory interpretation. It is time to take a holistic, less formalist approach to statutory interpretation. As I have explained previously, the court (some members more than others) silently takes a holistic approach anyway, despite lip service to the ambiguous/unambiguous/plain meaning shibboleths. In the present case, both the ambiguous and unambiguous/literal/plain meaning camps properly conclude that the "legislative history, legislative purpose, and public policy"[8] must be examined to determine the meaning of Wis. Stat. § 632.32(5)(i)2.

¶ 71. For the reasons set forth, I write separately.

¶ 72. DAVID T. PROSSER, J. (*concurring*). I write separately to address American Family's policy. In my view, American Family's reducing clause would not pass muster on these facts—irrespective of any statute—because it is at war with the reasonable expectation of its insured.

¶ 73. In interpreting insurance policies, courts apply the same rules of interpretation that apply to contracts generally. *Folkman v. Quamme,* 2003 WI 116, ¶ 12, 264 Wis. 2d 617, 665 N.W.2d 857. The objective in interpreting insurance policies is to give effect to the intent of the parties. *State Farm Mut. Auto. Ins. Co. v.*

---

[8] Majority op., ¶ 18.

*Langridge,* 2004 WI 113¶ 13, 275 Wis. 2d 35, 683 N.W.2d 75. "To do so, we give the words in the insurance policy their common and ordinary meaning, that is, the meaning a reasonable person in the position of the insured would have understood the words to mean." *Id.,* ¶ 14. If the text of the policy is unambiguous, "it is enforced as written, without resort to rules of construction or applicable principles of case law." *Folkman,* 264 Wis. 2d 617, ¶ 13.

¶ 74. When interpreting an insurance policy courts begin by determining whether the policy is ambiguous. *Langridge,* 275 Wis. 2d 35, ¶ 41. An insurance policy is ambiguous if it is "susceptible to more than one *reasonable* interpretation." *Id.,* ¶ 48 (internal citations omitted). Ambiguity in an insurance policy may arise in different ways. First, the language of the disputed provision may be ambiguous because the import of the words is uncertain or the impact of the words is uncertain with respect to unusual facts. Second, a provision that is unambiguous when viewed in isolation may become ambiguous when considered in the context of the entire policy.[1] *Folkman,* 264 Wis. 2d 617, ¶ 19.

¶ 75. The Shiras argue the reducing clause in their son's policy is ambiguous because it does not state that the uninsured motorist coverage limits will be reduced by the payment of worker's compensation benefits "to anyone." Because the policy lacked the phrase "to anyone," the Shiras contend American

---

[1] Although to date we have applied principles of contextual ambiguity only when evaluating underinsured motorist coverage, there is no reason that contextual ambiguity cannot arise in relation to reducing clauses in uninsured motorist coverage. *See Myers v. Gen. Cas. Co. of Wis.,* 2005 WI App 49, ¶ 18, 279 Wis. 2d 432, 694 N.W.2d 723.

Family's interpretation of its policy is contrary to the reasonable expectations of an insured.

¶ 76. In response, American Family argues that because the reducing clause in the policy mirrors Wis. Stat. § 632.32(5)(i), which they contend is unambiguous, an insured could not reasonably expect to have coverage under the facts of this case.

¶ 77. We have previously held that reducing clauses that mirror Wis. Stat. § 632.32(5)(i) can be contextually ambiguous. *Dowhower v. West Bent Mut. Ins. Co.,*, ¶¶ 33, 36, 236 Wis. 2d 113, 613 N.W.2d 557; *Schmitz v. Badger Mut. Ins. Co.,* 2000 WI 73, ¶ 49, 255 Wis. 2d 61, 647 N.W.2d 223. However, contextual ambiguity in those cases involved such factors as organization, labeling, explanation, inconsistency, omission, and the text of other provisions in the policy. *See Folkman,* 264 Wis. 2d 617, ¶ 19.

¶ 78. Here the reducing clause produces a result that is completely at odds with the reasonable expectation of an insured, because the insured would expect that reductions in uninsured policy limits would be based on payments made to or on behalf of the insured, the insured's heirs, or the insured's estate. This is why the court of appeals upheld the reducing clause in a case where worker's compensation payments were paid to an insured and the payments exceeded the insured's uninsured motorist policy limits. *See Myers v. Gen. Cas. Co. of Wis.,* 2005 WI App 49, 279 Wis. 2d 432, 694 N.W.2d 723.

¶ 79. The reducing clause in this policy is ambiguous because it is susceptible to more than one reasonable interpretation on the particular facts of this case. This is because the overall purpose of the policy is to provide coverage for the insured, the insured's heirs, or the insured's estate in the event of the insured's death,

at a level determined by the insured when purchasing the policy. Most of the time, a literal reading of the reducing clause is completely consistent with this purpose.

¶ 80. A reasonable insured could not be expected to anticipate that coverage might vary dramatically depending on whether the insured was married or single, whether the insured had dependents, or whether the insured was working or vacationing at the time of a fatal automobile accident. If Scott Shira had been traveling in Minnesota to attend a sporting event instead of conducting business, his estate would have received full coverage.

¶ 81. As long as an interpretation is reasonable, insurance policy terms "should be interpreted *as they would be understood from the perspective of a reasonable person in the position of the insured*[.]" *Langridge,* 275 Wis. 2d 35, ¶ 47 (internal citations omitted). A rational consumer in Scott's position would not expect that the uninsured motorist coverage for which he paid money could be reduced to nothing even though neither he nor his estate or his heirs had received any compensation for his injuries.

¶ 82. The court has repeatedly held that a policy is consistent with the reasonable expectations of an insured where it clearly sets forth that the insured purchased a fixed level of recovery that is arrived at by combining payments from all sources. *See Taylor v. Greatway Ins. Co.,* 2001 WI 93, ¶ 25, 245 Wis. 2d 134, 628 N.W.2d 916; *Dowhower,* 236 Wis. 2d 113, ¶ 33. Under American Family's interpretation, however, the reducing clause would not only deny an insured a fixed level of recovery but also do so without mentioning the

possibility that uninsured motorist limits could be reduced even though the insured or the insured's estate received nothing.

¶ 83. In fact, the policy is written in such a way that the insured is reasonably led to expect that coverage limits will be reduced only by payments that he actually receives. The Quick Reference page states: "This policy is a legal contract between you (the policyholder) and the company. . . . The policy details the rights and duties of you and your insurance company." This language combined with the very nature of insurance, where an insurer assumes financial responsibility for defined risks and losses suffered by an insured, establishes an expectation of contract benefits that is contrary to American Family's interpretation. Absent an explicit warning, an insured would not expect that payments from one third party to another third party could affect the contractual relationship the insured has with the insurer and give the insurer a windfall.

¶ 84. The second paragraph within the uninsured motorist portion of the policy, which sets forth American Family's general obligation, states:

> *We* will pay compensatory damages for *bodily injury* which an *insured person* is legally entitled to recover from the owner or operator of an *uninsured motor vehicle*. The *bodily injury* must be sustained by an *insured person* and must be caused by accident and arise out of the *use* of the *uninsured motor vehicle*.

Based on this paragraph, a reasonable insured would expect American Family ("We") to have to pay the Shiras. Scott suffered bodily injury—death—as that term is defined by the policy. Scott's death was caused by the driver of an uninsured motor vehicle. The Shiras are insured persons as that term is defined by the

policy.[2] Therefore, a reasonable insured would expect American Family to pay compensatory damages to the Shiras.

¶ 85. Finally, the immediate context of the reducing clause does nothing to dispel this expectation. In its entirety, the reducing provision states:

> The limits of liability of this coverage will be reduced by:
>
> 1. A payment made by the owner or operator of the uninsured motor vehicle or organization which may be legally liable.
>
> 2. A payment under the Liability coverage of this policy.
>
> 3. A payment made or amount payable because of bodily injury under any workers' compensation or disability benefits law or any similar law.

Clearly, the first example—a payment made by an owner or operator legally responsible—contemplates a scenario in which the insured receives payment. Similarly, the second example—a payment under the policy's liability coverage—contemplates a scenario in which an injured person would otherwise receive duplicate pay-

---

[2] In relevant part, the policy defines an insured person as "[a]nyone . . . entitled to recover damages due to bodily injury to you, a relative, or another occupant of your insured car." The circuit court ruled, and American Family did not appeal, that under Minnesota law the Shiras would be legally entitled to recover from the uninsured motorist.

As Arnold Anderson explains, the Shiras are Class III insureds; that is, "someone who has a derivative claim based on injury to a Class I [named insured] or Class II [occupancy insured] insured." Arnold P. Anderson, *Wisconsin Insurance Law* § 4.18 (5th ed. 2004).

ments under both the liability and uninsured motorist portions of the policy. A look at the liability portion of the policy confirms this expectation. It states: "Any amount payable under this coverage to or for an injured person *will be reduced by any payment made to that person* under the Uninsured Motorist coverage of this policy." This language creates an expectation of symmetry between the liability and uninsured motorist coverages that if payment is made under one portion of the policy, payment under the other portion will be reduced by that amount.

¶ 86.　Thus it is after two subparts in which uninsured motorist limits can be reduced only by payments to the insured that the insured reaches the portion of the policy in dispute. Given the context in which the worker's-compensation reducing clause appears, we conclude that a reasonable insured would reasonably expect that the uninsured motorist coverage limits would be reduced only by the worker's compensation benefits that the insured, the insured's heirs, or the insured's estate actually received.

¶ 87.　The court has held that a policy is contrary to the reasonable expectations of an insured and offers illusory coverage where the policy does not "clearly set forth that the insured is purchasing a fixed level of UIM recovery arrived at by combining payments from all sources." *Schmitz,* 255 Wis. 2d 61, ¶ 75. A fortiori, a policy in which a reducing clause is effective *before* the insured ever receives the amount of the uninsured motorist limits from all sources, and which contains no mention of this possibility, is contrary to the reasonable expectations of an insured. *If* such a reducing clause were allowed by Wis. Stat. § 632.32(5)(i)2., I would hold that to counter the reasonable expectations of an insured the uninsured motorist policy would have to state

167

explicitly that the limits would be reduced by worker's compensation benefits paid to the Fund, not just to the insured.

¶ 88. I am authorized to state that Justice PATIENCE DRAKE ROGGENSACK joins this opinion.