Raymond P. Taffora Deputy Attorney General17 W. Main Street P.O. Box 7857 Madison, WI 53707-7857 www.doj.state.wi.us
The Honorable Steve Nass State Representative 12 West, State Capitol Madison, WI 53702
The Honorable Scott Suder State Representative 324 East, State Capitol Madison, WI 53702
The Honorable Bob Ziegelbauer State Representative 207 North, State Capitol Madison, WI 53702
The Honorable Don Pridemore State Representative 318 North, State Capitol Madison, WI 53702
The Honorable Gary Tauchen State Representative 9 West, State Capitol Madison, WI 53702
The Honorable Rich Zipperer State Representative 307 North, State Capitol Madison, WI 53702
The Honorable Glenn Grothman State Senator 20 South, State Capitol Madison, WI 53702
The Honorable Mary Lazich State Senator 109 South, State Capitol Madison, WI 53702
The Honorable Joseph Leibham State Senator 127 South, State Capitol Madison, WI 53702
The Honorable Alan Lasee State Senator 220 South, State Capitol Madison, WI 53702
The Honorable Thomas Lothian State Representative 306 North, State Capitol Madison, WI 53702
The Honorable Samantha Kerkman State Representative 103 West, State Capitol Madison, WI 53702
Named Representatives and Senators *Page 2 
The Honorable Steve Kestell State Representative 320 East, State Capitol Madison, WI 53702
The Honorable Carol Owens State Representative 315 North, State Capitol Madison, WI 53702
The Honorable Gene Hahn State Representative 15 West, State Capitol Madison, WI 53702
The Honorable Daniel LeMahieu State Representative 17 North, State Capitol Madison, WI 53702
The Honorable Spencer Coggs State Senator 22 South, State Capitol Madison, WI 53702
The Honorable Mark Miller State Senator 106 South, State Capitol Madison, WI 53702
The Honorable Fred Kessler State Representative 302 North, State Capitol Madison, WI 53702
The Honorable Lena C. Taylor State Senator 3 South, State Capitol Madison, WI 53702
The Honorable Spencer Black State Representative 210 North, State Capitol Madison, WI 53702
The Honorable Sheryl Albers State Representative 115 West, State Capitol Madison, WI 53702
The Honorable John Townsend State Representative 22 West, State Capitol Madison, WI 53702
The Honorable Karl Van Roy State Representative 123 West, State Capitol Madison, WI 53702
The Honorable Tamara Grigsby State Representative 122 North, State Capitol Madison, WI 53702
The Honorable Jon Erpenbach State Senator 19 South, State Capitol Madison, WI 53702
The Honorable Leon Young State Representative 118 North, State Capitol Madison, WI 53702
The Honorable Josh Zepnick State Representative 219 North, State Capitol Madison, WI 53702
The Honorable Jason Fields State Representative 109 North, State Capitol Madison, WI 53702
The Honorable Gary Hebl State Representative 304 West, State Capitol Madison, WI 53702 *Page 3 
The Honorable Christine Sinicki State Representative 321 West, State Capitol Madison, WI 53702
The Honorable Mike Sheridan State Representative 9 North, State Capitol Madison, WI 53702
The Honorable Robert Turner State Representative 212 North, State Capitol Madison, WI 53702
Dear Representatives and Senators:
Representative Nass, fourteen other Representatives, and four Senators have asked me to determine that the University of Wisconsin System's ("UW System") new freshman admissions policy, Regent Policy 07-01, adopted February 9, 2007, violates the portion of Wis. Stat. § 36.11(3)(a) (2005-2006) which provides that "[n]o . . . tests based upon race . . . shall ever be allowed in the admission of students . . ." to UW System institutions. Representative Tamara Grigsby, thirteen other Representatives, and four Senators have asked me to determine that Regent Policy 07-01 does not violate the quoted portion of Wis. Stat. §36.11(3)(a).
In Wisconsin, the Attorney General's power and authority is defined by and limited by statute. State v. City of Oak Creek, 2000 WI 9, ¶ 32,232 Wis. 2d 612, 605 N.W.2d 526. By statute, the Attorney General is authorized to give formal written opinions on any question of law only to the Legislature, to either house thereof, to the Senate or Assembly Committees on Organization, or to the heads of any department of state government. Wis. Stat. § 165.015(1).[1]In light of the widespread expression of legislative interest in this question, and the nearly even balance of expressed views on the merits of the matter, I have concluded that the public interest will best be served if I provide each of you with the results of my evaluation of the application of Wis. Stat. § 36.11(3)(a) and the United States Constitution to the University policy at issue in your requests.
1. University Admission Policy and Wisconsin statutes involved.
 Regent Policy 07-01, adopted on February 9, 2007, as Board of Regents Resolution 9290, sets forth the threshold qualifications a student must have in order to be considered for admission, limits total non-resident undergraduate enrollment to 25 percent (excluding *Page 4 
Minnesota reciprocity students) at any institution, and sets forth the following "Admissions Criteria" (underlining added):
 Freshman applicants must demonstrate that they are prepared to do satisfactory academic work at the institution to which they are applying, and that, as members of the campus community, they will benefit from and enrich the educational environment and enhance the quality of the institution. In making this determination, applicants will be given a comprehensive review based upon the following criteria:
 A. Academics. Academic factors are the most important consideration in making admissions decisions. Factors that will be considered include, but are not limited to, the quality and rigor of the applicant's college-preparatory coursework, grade point average, class rank and trend in grades.
 B. Standardized Test Scores. ACT or SAT scores are used to provide additional academic information about the quality of an applicant's qualifications, but cannot be the sole criteria for admission. An institution may require additional test scores of some or all applicants as supplemental information.
 C. Other factors. Other considerations include, but are not limited to, student experiences, work experience, leadership qualities, motivation, community service, special talents, status as a non-traditional or returning adult, status as a veteran of the U.S. military, whether the applicant is socio-economically disadvantaged, and whether the applicant is a member of an historically underrepresented racial or ethnic group.
 Wisconsin Stat. § 36.11(3)(a) (2005-06) provides (underlining added):
 The board shall establish the policies for admission within the system and within these policies each institution shall establish specific requirements for admission to its courses of instruction. No sectarian or partisan tests or any tests based upon race, religion, national origin of U.S. citizens or sex shall ever be allowed in the admission of students thereto."
 Legislative history of Wis. Stat. § 36.11(3)(a). Wisconsin Stat. § 36.11(3)(a) was created by ch. 335, sec. 7, Laws of 1973, effective July 8, 1974. The text of Wis. Stat. § 36.11(3)(a) has remained unchanged since it was enacted in 1974 as part of the creation of the UW System. That creation began in October 1971, through legislation that combined the *Page 5 
University of Wisconsin[2] and the Wisconsin State Universities[3]
into the UW System under the direction of a single Board of Regents. Ch. 100, Laws of 1971 (effective October 11, 1971).
At the time of the 1971 merger, Wis. Stat. § 36.06(1) (1971) prohibited certain types of discrimination in UW System admissions. That statute provided, in relevant part (underlining added):[4]
 The board of regents shall . . . determine the moral and educational qualifications of applicants for admission to the various courses of instruction; but . . . no sectarian or partisan tests shall ever be allowed or exercised in the appointment of regents or in the election of professors, teachers or other officers of the university, or in the admission of students thereto or for any purpose whatever.
Wisconsin Stat. § 36.06(1) (1971) had its genesis in ch. 114, sec. 7, Laws of 1866. That early legislation provided, in relevant part (italics in original, underlining added):
 The regents . . . shall have power, and it shall be their duty . . . to determine the moral and educational qualifications of applicants for admission to the various courses of instruction: provided, that . . . no sectarian or partisan test shall ever be allowed or exercised . . . in the admission of students thereto, or for any purpose whatever.
The initial merger legislation required the Governor to appoint a broadly based merger implementation study committee to make recommendations to the Board of Regents and the *Page 6 
Legislature by January 31, 1973, on merging chapters 36 and 37 of the Wisconsin Statutes in many different areas, including "admissions and tuition policies." Ch. 100, sec. 26, Laws of 1971. In July 1972, the Board of Regents adopted a Freshman Admissions Policy, Regent Policy Document ("RPD") 72-11. In relevant part, that policy provided:
 Students lacking rank-in-class or test score qualifications may be considered if, on the basis of other factors, they appear to have a reasonable probability of success. Particular consideration in admission will be given to applicants who have been out of school for two or more years, service veterans with at least 180 days of active duty, and to students who have been disadvantaged as a result of substandard education, family income level, or ethnic background.
The Merger Implementation Study Committee ("MISC") issued its recommendations for merging Wis. Stat. chs. 36 and 37 in January 1973. At that time, the statutory and administrative policies regarding university admissions can be summarized as follows. Pursuant to the authority granted by Wis. Stat. §§ 36.06(1) and 37.11(7) (1971) to determine student admission standards, the Board of Regents adopted a freshman admissions policy that required evidence that an applicant was prepared to do satisfactory work, and allowed students to demonstrate that preparation through rank-in-class, test scores, or for students who lacked those qualifications, on the basis of other factors, particularly including returning students, service veterans, and students who were disadvantaged as a result of substandard education, family income level, or ethnic background. Pursuant to the limitations in Wis. Stat. § 36.06(1) (1971), the Board of Regents could not use any "sectarian or partisan tests" in the admission of students.
The MISC Report contained a section on the UW System's progress in the study areas designated in ch. 100, sec. 26, Laws of 1971, a section that contained proposed language for a new chapter 36 of the Wisconsin Statutes, and a section that contained comments on the proposed statutory language.
The section on progress in the area of admissions policy concluded that, with the adoption of RPD 72-11, "a further extension of educational opportunities to the State's citizens has been achieved." MISC Report, Annex D at 2. The MISC Report compared the technical admissions requirements prior to merger with post-merger requirements to "demonstrate the expanded access to the UW System." Id. After quoting the RPD 72-11 paragraph quoted above, which specifically permitted the university to consider ethic background as a factor in admission decisions, the MISC Report described the approach used by admissions offices as follows (id. at 3):
 Each admissions office uses what might be termed a clinical approach. They look beyond the technical criteria above to the less tangible, motivational factors. In addition, nearly every [institution's] admissions requirements could be described as a set of contingent criteria. That is, if a student does not qualify on the basis of class rank, he may qualify on his/her performance on a test. Furthermore, if an applicant fails to qualify on the grounds of high school class rank or test scores, *Page 7 
the option still remains to enter on probation or as a "special" student. These contingency-probationary options for entry into a[n institution] of the UW System eliminate nearly any kind of serious obstacle toward acceptance at a campus.
The MISC Report recommended the following language for a new statutory section 36.11(3)(a) (MISC Report, Annex B at 11):
 The board shall establish the policies for admission within the system and within these policies each institution shall establish specific requirements for admission to its courses of instruction. No sectarian or partisan tests or any tests based on race, religion, national origin or sex shall ever be allowed in the admission of students thereto.
The MISC's comment to proposed section 36.11(3)(a) provided (MISC Report, Attachment A at 9):
 Section 36.11(3) relating to admissions is based upon portions of existing ss. 20.285(j), 36.06(1), and 37.11(7). It combines the new direction of the legislature in regard to autonomy while maintaining the older directives in regard to overall admissions requirements and discrimination. MISC noted the fact that the board had already set broad system admissions guidelines and that the individual institutions might set institutional standards which could be more restrictive. This situation clearly is within the intent of the proposed section. A proposal for a statutory requirement that the board establish a core curriculum was strongly rejected by MISC.
In May 1973, a bill representing the MISC's recommendations for governance of merged UW System was introduced. 1973 Assembly Bill 930. Proposed section 36.11(3)(a) was introduced exactly as the MISC had recommended it. Language changing "tests based upon . . . national origin" to "tests based upon . . . national origin of U.S. citizens" was added by Assembly Amendment 6 to the Bill. The Bill did not pass the Assembly until the spring session of 1974, and died for lack of Senate action when the regular session ended. A bill containing the language of current Wis. Stat. § 36.11(3)(a) was introduced as April 1974 Special Session Senate Bill 2, was passed as ch. 335, Laws of 1973, and became law on April 9, 1974.
The admissions nondiscrimination provision adopted by the 1973 Legislature borrowed the "test" terminology directly from the predecessor 1866 statute prohibiting the use of any "sectarian or partisan test" in admissions, and extended the prohibition to "tests based upon race, religion, national origin of U.S. citizens [and] sex." Wis. Stat. § 36.11(3)(a) (1973). *Page 8 
 2. Statutory analysis.
The goal of statutory interpretation is to discern and give effect to the intent of the Legislature. Teschendorf v. State Farm Ins. Cos.,2006 WI 89, ¶ 11, 293 Wis. 2d 123, 717 N.W.2d 258. Statutory interpretation begins with the language of the statute, and if the meaning there is plain, the inquiry ordinarily ends. Id., ¶ 12. To ascertain meaning, one must do more than focus on a single, isolated sentence or portion of a sentence; one must look to the role of the relevant language in the entire statute. Id. One must consider the context in which words appear, the structure of the statute, and the purpose of the statute where it is evident from the statutory text. Id.
One may look to legislative history as an extrinsic source of meaning to confirm the plain meaning of the statute, or to verify that the Legislature did not intend unreasonable or unthinkable results produced by the apparent plain meaning of the statute, or if the statute is ambiguous after considering all of the intrinsic sources of meaning. Id., ¶¶ 13-15. If a statute is ambiguous, one may consider the interpretation of the administrative agency charged with enforcing the statute as an additional extrinsic source of meaning, UFE Inc. v. LIRC, 201 Wis. 2d 274,282, 548 N.W.2d 57 (1996), and apply an appropriate level of deference to the agency's interpretation.
The February 20, 2007, letter from Representative Nass and eighteen other legislators asserts that the provision of Regent Policy 07-01 that permits the consideration of race as one factor in admissions decisions violates the prohibition in Wis. Stat. § 36.11(3)(a) against "tests based upon race" in admissions.
In construing statutes, words that have a special meaning in the law are to be given that meaning. State v. Anderson, 2005 WI 54, ¶ 43,280 Wis. 2d 104, 695 N.W.2d 731; Wis. Stat. § 990.01(1) (2005-06). Wisconsin Stat. § 36.11(3)(a) prohibits the use of several types of "tests" in admissions decisions, including religious tests. The term "religious test" has a special meaning in the law that clarifies the prohibitions in Wis. Stat. § 36.11(3)(a).
Both the United States Constitution and the Wisconsin Constitution prohibit the use of religious tests as a qualification for public office.See U.S. Const. art VI ("no religious test shall ever be required as a qualification to any office or public trust under the United States"); Wis. Const. art. I, § 19 ("No religious tests shall ever be required as a qualification for any office of public trust under the state . . ."). These provisions are widely viewed as a reaction to the unfortunate tendency of early immigrants to this country, who themselves had fled Europe to escape religious test oaths, to be "perfectly willing, when they had the power to do so, to force dissenters from their faith to take test oaths in conformity with that faith." Torcaso v. Watkins,367 U.S. 488, 490 (1961). Thus, for example, the constitutions of several states required *Page 9 
state officeholders to profess the protestant religion. U.S. TermLimits, Inc. v. Thornton, 514 U.S. 779, 825 n. 35 (1995).[5] The Maryland statute at issue in Torcaso that required officeholders to make "`"a declaration of belief in the existence of God,"`" 367 U.S. at 489, "was designed to . . . bar every person who refuses to declare a belief in God from holding a public `office of profit or trust' in Maryland."Id. at 489-90. As used in the law, a "religious test" is a standard based on the profession of a religious belief that acts as a disqualification for anyone who fails to satisfy the standard.[6]
Applying the special meaning of "test" used in the term "religious test" to the other categories in Wis. Stat. § 36.11(3)(a) (2005-06), the statute plainly prohibits the Board of Regents from creating admissions standards based on sect, political partisanship, race, religion, sex, and national origin of U.S. citizens, that would disqualify applicants who do not satisfy those standards.
This plain meaning is confirmed by the statute's legislative history. The MISC Report made the Legislature aware that the post-merger Board of Regents adopted RPD 72-11. That system-wide admissions policy de-emphasized objective admissions standards, narrowly based on rank-in-class and standardized test scores, and expanded the bases on which admission decisions could be made. The policy allowed admission on the basis of multi-factored and individualized criteria that looked to "less tangible, motivational factors" designed to "eliminate nearly any kind of serious obstacle toward acceptance at a campus." MISC Report, Annex D at 3. The MISC Report, Annex D at 3, made the Legislature aware that RPD 72-11 required UW System institutions to particularly consider the applications of students who had been *Page 10 
disadvantaged by prior educational opportunities, family income, or ethnic background, and directed admissions staff to consider factors in those applications in addition to class rank and test scores that appeared to demonstrate that those disadvantaged students would have a reasonable probability of success if admitted. In light of this information about the university's policy permitting the use of "disadvantaged . . . ethnic background" as a "plus" factor in multi-factored, individualized admissions decisions and the special legal meaning of the term "test" as a standard which disqualifies a person, it is clear that the Legislature could not have intended the prohibition of "tests based on race" to mean anything except to prohibit the use of race as a disqualification for admission. The statute does not prohibit the use of race as a factor that would benefit a student's opportunity for admission. Thus, Regent Policy 07-01, which expressly permits admissions on the basis of factors in addition to academics and test scores, including "whether the applicant is a member of an historically underrepresented racial or ethnic group," does not violate the prohibition in Wis. Stat. § 36.11(3)(a) against using race as a test to disqualify an applicant for admission to a UW System institution.
Even if there were ambiguity as to whether Wis. Stat. § 36.11(3)(a) prohibited the use of race as a factor that would benefit a student's opportunity for admission, a reviewing court would very likely give considerable deference to the Board of Regents' interpretation of the statute reflected in Regent Policy 07-01. An administrative agency's interpretation of a statute is entitled to "great weight" deference if four requirements are met:
 (1) the agency was charged by the legislature with the duty of administering the statute; (2) the interpretation of the agency is one of long-standing; (3) the agency employed its expertise or specialized knowledge in forming the interpretation; and (4) the agency's interpretation will provide uniformity in the application of the statute.
DaimlerChrysler v. LIRC, 2007 WI 15, ¶ 16, ___ Wis. 2d ___,727 N.W.2d 311, reconsideration denied, 2007 WI 40, ___ Wis. 2d ___,729 N.W.2d 212. The Board of Regents' interpretation of Wis. Stat. § 36.1 1(3)(a), reflected in Regent Policy 07-01, satisfies each of those four requirements. Where "great weight" deference is appropriate, a court will refrain from substituting its view of the law for that of the agency charged with administration of the law, and will sustain the agency's conclusions of law if they are reasonable — even if an alternative view of the law is just as reasonable or even more reasonable.DaimlerChrysler, 2007 WI 15, ¶ 16.
3. Constitutional considerations.
Although the language of the UW System's admissions policy does not conflict with the language of Wis. Stat. § 36.11(3)(a), the UW System must be very careful in applying any race-conscious college admissions policy if it is to comply with the equal protection requirements of the state and federal constitutions.
Where the government uses a racial classification to subject a person to unequal treatment, the government bears the burden of demonstrating that the use of race employs *Page 11 
"narrowly tailored measures that further compelling governmental interests." Adarand Constructors, Inc. v. Peña, 515 U.S. 200, 227
(1995). As a general matter, the courts will defer to a university's judgment in admissions policies about the composition of the student body needed to fulfill the institution's educational mission. Grutter v.Bollinger, 539 U.S. 306, 329 (2003). Indeed, given the expansive freedom of speech and thought associated with the university environment, universities have a compelling interest in attaining a diverse student body. Id. at 528, 529. Like the University of Michigan Law School whose admissions policies were considered in Grutter, the UW System's admissions policy seeks a student body that will "provide the highest quality educational opportunity for all students in a diverse learning environment." Regent Policy 07-01.
Even when drawing racial distinctions is permissible to further a compelling state interest, the government is constrained in how it may pursue that end."`[T]he means chosen to accomplish the [government's] asserted purpose must be specifically and narrowly framed to accomplish that purpose.'" Grutter, 539 U.S. at 333, quoting Shaw v. Hunt,517 U.S. 899, 908 (1996)."To be narrowly tailored, a race-conscious admissions program cannot use a quota system — it cannot `insulat[e] each category of applicants with certain desired qualifications from competition with all other applicants.'" Grutter, 539 U.S. at 334, quoting Regents of University of California v. Bakke, 438 U.S. 265, 315
(1978). See also Gratz v. Bollinger, 539 U.S. 244 (2003) (decided the same day as Grutter; invalidating as not "narrowly tailored" an admissions policy that automatically distributed 20 points — one-fifth of those needed to guarantee admission — to every single underrepresented minority applicant solely because of the applicant's race). A university may consider race or ethnicity only as a "`"plus" in a particular applicant's file,' without `insulat[ing] the individual from comparison with all other candidates for available seats.'" Grutter, 539 U.S. at 334, quoting Bakke, 438 U.S. at 317. An admissions program must be "`flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration, although not necessarily according them the same weight.'" Grutter, 539 U.S. at 334, quoting Bakke, 438 U.S. at 317. When race is used as a "plus" factor in a race-conscious admissions program, the program must "ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application." Grutter, 539 U.S. at 337. In addition, because "`[a] core purpose of the Fourteenth Amendment was to do away with all governmentally imposed discrimination based on race[,]' . . . race-conscious admissions policies must be limited in time." Grutter, 539 U.S. at 341-42, quoting Palmore v. Sidoti,466 U.S. 429, 432 (1984).
On its face, Regent Policy 07-01 contains the features of the University of Michigan Law School admissions policy upheld in Grutter.Compare Grutter, 539 U.S. at 315-16 (description of law school admissions policy) with Regent Policy 07-01. Both policies focus on academic ability coupled with a flexible assessment of applicants' talents and potential to contribute to, and benefit from, a diverse educational environment. Both policies avoid the creation of a "quota" system for applicants and avoid a narrow or numerical definition of the concept of diversity. Both policies require an individualized and holistic assessment of each applicant. Both policies allow the consideration of an applicant's race or ethnicity as one of many criteria *Page 12 
that can be considered in making individualized admissions decisions. Neither policy permits the automatic acceptance or rejection of an applicant based on any single "soft variable" (the Michigan term) or "other consideration" (the UW System term). The UW System policy requires the Board of Regents' review every five years.
The conclusion that Regent Policy 07-01 is facially consistent with the requirements of equal protection is not affected by the United States Supreme Court's recent decision in Parents Involved in Community Schoolsv. Seattle School District No. 1, et al., 2007 WL 1836531 (June 28, 2007). In that case, a majority of the Court joined in distinguishing the race-conscious school assignment policies impermissibly employed by the Seattle and Louisville public school districts to achieve racial balance from the law school admissions policy upheld in Grutter. Id. at *12-*14. The Seattle school district classified children as white or nonwhite, and used that racial classification as one of the "tiebreakers" used to allocate admissions to the high schools that were the first choice of more ninth-graders than could be accommodated in the school's freshman class, where the white/nonwhite composition of the student body of the oversubscribed school was not within 10 percentage points of the district's overall white/nonwhite racial balance. Id. at *6. The Louisville school district classified children as black or other, and used that racial classification to assign students to elementary schools and decide transfer requests. Id. The Louisville district required all nonmagnet schools to maintain a black enrollment of not less than 15 percent and not more than 50 percent. Id. at *8. Thus, "[i]n each [district,] the school district relie[d] upon an individual student's race in assigning that student to a particular school, so that the racial balance at the school [fell] within a predetermined range based on the racial composition of the school district as a whole." Id. at *6.
By contrast, the University of Michigan law school admissions policy upheld in Grutter and Regent Policy 07-01 each is an "admissions program . . . [that] focuse[s] on each applicant as an individual, and not simply as a member of a particular racial group." 2007 WL 1836531, at *13."The classification of applicants by race upheld in Grutter was only as part of a `highly individualized, holistic review,' 539 U.S., at 337. . . ."Id. The Court observed that "[t]he point of the narrow tailoring analysis in which the Grutter Court engaged was to ensure that the use of racial classifications was indeed part of a broader assessment of diversity, and not simply an effort to achieve racial balance, which the Court explained would be `patently unconstitutional.' [Grutter,] at 330. . . ." Id.
During the time Regent Policy 07-01 will be applied by each UW System institution, academic factors must continue to be "the most important consideration in making admissions decisions." Regent Policy 07-01, Sec. II.A. To the extent that a UW System institution takes the race of an applicant into account as an "other consideration," it must do so on the basis of a holistic, individualized evaluation of the application (that is, evaluating each application against the stated admissions criteria), in order to continue to comply with the constitutional requirement of equal protection. My office stands ready to assist the UW System and its member institutions to ensure that admissions are conducted in accordance with these constitutional requirements. *Page 13 
Thank you for your interest in this important matter of public policy.
Sincerely,
J.B. Van Hollen
Attorney General
JBVH:RPT:BAO:ajw
c: Kevin P. Reilly
President
University of Wisconsin System
Patricia A. Brady, Esq.
General Counsel
University of Wisconsin System
[1] The Attorney General is also authorized to provide advice to district attorneys, Wis. Stat. § 165.25(3), and county corporation counsel, Wis. Stat. § 59.42(1)(c), in matters pertaining to the duties of their offices.
[2] Article X, section 6 of the Wisconsin Constitution directed the Legislature to establish a state university at or near the seat of state government. The article also provides that "no sectarian instruction shall be allowed in such university." Id.
[3] The Wisconsin State Universities system had its origin in an 1857 state law creating the Board of Regents of Normal Schools.
[4] At the time of the merger legislation, there was no statutory counterpart to Wis. Stat. § 36.06(1) (1971) regarding admissions to Wisconsin State Universities institutions. Wisconsin Stat. § 37.11(7) (1971) provided that the regents of those universities may "[p]rescribe rules for the admission of students; but every applicant for admission shall undergo an examination to be prescribed by the board of regents, and shall be rejected if it appears that he is not of good moral character."
In addition to the admissions standards for chapter 36 institutions in Wis. Stat. § 36.06(1) (1971) and for chapter 37 institutions in Wis. Stat. § 37.11(7) (1971), Wis. Stat. § 20.285(1)(j) (1971) provided, in relevant part, that "[n]o resident of this state who is qualified under the minimum standards of the university of Wisconsin or the state universities shall be denied acceptance for enrollment."
[5] These early constitutions followed a pattern established in England in the Test Act
of 1673, which barred from public office those who did not belong to the Church of England. 25 Car. II 2.
[6] In Wisconsin, the terms "sectarian" and "religious" have different meanings. Wisconsin Const. art. X, § 3, for example, provides that "no sectarian instruction shall be allowed" in district schools. See also
Wis. Const. art. X, § 6 similarly provides that "no sectarian instruction shall be allowed in [the state] university." Cf. Wis. Const. art. I, § 19 (barring "religious tests" for state public offices). At the time the Wisconsin Constitution was adopted, "sectarian" referred to "religious doctrines which are believed by some religious sects, and rejected by others." State ex rel. Weiss and others v. District Board,etc., 76 Wis. 177, 193, 44 N.W.2d 967 (1890)."Sectarian" beliefs were distinguished from beliefs shared by all religious sects, such as the existence of a supreme being. Id. at 192-93. So construed, the prohibition in ch. 114, sec. 7, Laws of 1866 and Wis. Stat. § 36.06(1) (1971) against using a "sectarian . . . test" in admissions raises the inference that the Board of Regents could not disqualify applicants from admission on the basis that the applicant was Roman Catholic or Protestant or Jew or Muslim, but might be authorized to disqualify an applicant from admission because he or she was a non-believer. The addition of "tests based upon . . . religion" to Wis. Stat. § 36.11(3)(a) (1973) to the list of prohibited grounds for disqualification eliminated that inference.