**2025 WI 29**

# Supreme Court of Wisconsin



SERVICE EMPLOYEES INTERNATIONAL UNION HEALTHCARE WISCONSIN, et al.
*Petitioner-Appellant,*

*v.*

WISCONSIN EMPLOYMENT RELATIONS COMMISSION,
*Respondent-Respondent.*

No. 2024AP717
Decided Friday, June 27, 2025

APPEAL from a judgment and order of the Dane County Circuit
Court (Jacob B. Frost, J.) No. 2022CV3199

HAGEDORN, J., delivered the majority opinion for a unanimous Court. REBECCA GRASSL BRADLEY, J., filed a concurring opinion, in which ZIEGLER, J., joined. DALLET, J., filed a concurring opinion, in which ANN WALSH BRADLEY, C.J., KAROFSKY, and PROTASIEWICZ, JJ., joined.

¶1    BRIAN HAGEDORN, J.   The University of Wisconsin Hospitals and Clinics Authority (the Authority) is a "public body corporate and politic" that was created by the legislature in 1995. At the time of its creation, the legislature incorporated the Authority into numerous statutes, including the Wisconsin Employment Peace Act (Peace Act), which generally covers collective bargaining for private employers. The legislature explicitly named the Authority as a covered employer in the Peace Act and required it to engage in collective bargaining, while providing a variety of other related changes. In 2011, however, these

changes were reversed when Act 10 was signed into law. Among other things, it removed references to the Authority as a covered employer in the Peace Act and deleted the requirement that it engage in collective bargaining.

¶2 The question in this case is whether, despite the changes occasioned by Act 10, the Authority is still required to engage in collective bargaining under the Peace Act. The answer is no. When we examine the statutory language along with the statutory history, it is clear that Act 10 ended the collective bargaining requirements formerly placed on the Authority.

## I. PROCEDURAL BACKGROUND

¶3 Prior to Act 10, employees of the Authority were represented in collective bargaining by the Service Employees International Union (SEIU). After Act 10 and the expiration of existing contracts, collective bargaining between the Authority and its employees ended. In recent years, the Authority's employees asked it to once again recognize SEIU as their collective bargaining agent. When the Authority declined, the Authority's employees threatened a strike. In response, the Authority and SEIU entered into a "Memorandum of Understanding," which averted the strike and led to this litigation. Pursuant to this agreement, SEIU and the Authority petitioned the Wisconsin Employment Relations Commission (WERC) to determine whether the Authority was still an employer under the Peace Act and therefore required to collectively bargain with its employees.

¶4 WERC concluded that the Peace Act no longer requires the Authority to engage in collective bargaining, citing Act 10's amendments to the Peace Act and the statutes that govern the Authority. SEIU sought review of WERC's decision in the circuit court. The circuit court affirmed WERC's decision, and SEIU appealed. The Authority then filed a petition to bypass the court of appeals, which we granted.

## II. DISCUSSION

### A. STANDARD OF REVIEW

¶5 Judicial review of agency decisions is governed by chapter 227 of the Wisconsin Statutes. We assume a deferential posture toward WERC's conclusions of fact, but review issues of law de novo. WIS. STAT.

§ 227.57(3), (11) (2023–24).[1] The dispute in this case centers on whether the Authority is required to collectively bargain with its employees. This is a matter of statutory interpretation, a quintessential question of law. *Serv. Emps. Int'l Union, Loc. 1 v. Vos*, 2020 WI 67, ¶28, 393 Wis. 2d 38, 946 N.W.2d 35.

¶6      In one sense, this case presents a straightforward statutory interpretation question. But SEIU's arguments are rooted not just in what the statutes mean, but in how we should interpret the law more generally. We begin with SEIU's methodological challenge, taking this opportunity to clarify our approach to statutory interpretation and the role statutory history plays in it.

### B.  STATUTORY HISTORY AND STATUTORY INTERPRETATION

¶7      It is the "solemn obligation of the judiciary to faithfully give effect to the laws enacted by the legislature." *State ex rel. Kalal v. Cir. Ct. for Dane Cnty.*, 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110. Statutory interpretation is aimed at just that—discerning the meaning of the statute's enacted language. This interpretive process rests on an important foundation that guides our approach. Namely, the written text is the law; that is what legislators voted on and binds the public. *Id.* Therefore, when determining what a statute means, we focus on "the enacted law, not the unenacted intent" of lawmakers. *Id.*

¶8      Given this underpinning, our cases identify two types of sources for statutory meaning: intrinsic and extrinsic. Intrinsic sources are those based on or derived from the enacted law itself. 2A NORMAN J. SINGER & J.D. SHAMBIE SINGER, SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 45:14 (7th ed. 2014). Intrinsic sources include the statutory text at issue, related statutes and phrases, a statute's place within the statutory structure, its stated or textually manifest purpose, and statutory history. *Kalal*, 271 Wis. 2d 633, ¶¶45, 46, 48–49, 52 n.9. Extrinsic sources, by contrast, are "interpretive resources outside the statutory text—typically items of legislative history." *Id.*, ¶50. Intrinsic sources are primary in determining the plain meaning of a statute, while extrinsic

---

[1] All subsequent references to the Wisconsin Statutes are to the 2023–24 version unless otherwise indicated.

sources are secondary and used to confirm that plain meaning or resolve any ambiguity. *Id.*, ¶51.

¶9     In this case, SEIU says we should keep a steely-eyed focus on the main statutory text and only turn to statutory history and other such sources after determining the plain meaning of the text by itself. SEIU contends that statutory history is not part of a plain meaning analysis and should only be consulted when the text on its own is ambiguous. As support, it points to our oft-quoted guidepost that "[i]f the meaning of the statute is plain, we ordinarily stop the inquiry." *See id.*, ¶45; *Brey v. State Farm Mut. Auto. Ins. Co.*, 2022 WI 7, ¶11, 400 Wis. 2d 417, 970 N.W.2d 1. SEIU is incorrect.

¶10     Our statement in *Kalal* does not mean statutory interpretation begins and ends with a myopic focus on the singular statutory provision in question. Rather, statutory interpretation begins and is usually complete only after a full consideration of all relevant intrinsic sources. *See Kalal*, 271 Wis. 2d 633, ¶¶43, 46, 48–49. *Kalal* explicitly rejected SEIU's language-only argument. *Id.*, ¶49. It was not necessary, we said, for the language of a statute to be deemed ambiguous before a reviewing court looks at intrinsic sources such as scope, history, and context. *Id.*, ¶48. Instead, we clarified that these other sources "are perfectly relevant to a plain-meaning interpretation of an unambiguous statute as long as the scope, context, and purpose are ascertainable from the text and structure of the statute itself." *Id.* To be sure, a careful examination of the particular statutory text in question is necessary. But a "statute's context and structure are" likewise "critical to a proper plain-meaning analysis." *Brey*, 400 Wis. 2d 417, ¶11. Therefore, determining a provision's plain meaning requires consideration of all relevant intrinsic sources.

¶11     SEIU also misses the mark on the role of statutory history, which "involves comparing the statute with its prior versions." *Id.*, ¶20. Since statutory history analyzes enacted law, it is an intrinsic source that is "part and parcel of a plain meaning interpretation."[2] *Banuelos v. Univ. of Wis. Hosps. & Clinics Auth.*, 2023 WI 25, ¶25, 406 Wis. 2d 439, 988

_____

[2] This contrasts with legislative history, which is the "byproduct of legislation." *Brey v. State Farm Mut. Auto. Ins. Co.*, 2022 WI 7, ¶21, 400 Wis. 2d 417, 970 N.W.2d 1.

N.W.2d 627. Statutory history is therefore part of the statutory context and, where relevant, should be examined when a court determines the meaning of a statutory provision. *Richards v. Badger Mut. Ins. Co.*, 2008 WI 52, ¶22, 309 Wis. 2d 541, 749 N.W.2d 581.

¶12    In short, SEIU's argument—that statutory history should not be consulted when the "plain meaning" of the disputed provision is unambiguous—is simply mistaken and inconsistent with decades of statutory interpretation cases from this court. Rather, all intrinsic sources—text, context, and structure—are essential components of a plain meaning analysis. *Kalal*, 271 Wis. 2d 633, ¶46; *Banuelos*, 406 Wis. 2d 439, ¶25; *Brey*, 400 Wis. 2d 417, ¶¶11, 20; *Wis. Just. Initiative, Inc. v. WEC*, 2023 WI 38, ¶19, 407 Wis. 2d 87, 990 N.W.2d 122 (Statutory interpretation focuses on "the statutory text, read reasonably, along with relevant statutory context and structure.").

¶13    With this in mind, we turn to the substantive legal question before us.

## C.  LEGAL ANALYSIS

¶14    The essential question before us is whether SEIU is correct that the Authority is a covered employer under the Peace Act and therefore required to engage in collective bargaining.

### 1.  Statutory Background

¶15    Wisconsin has three main statutes that govern collective bargaining, each found in chapter 111 of the Wisconsin Statutes. The Municipal Employment Relations Act (MERA)[3] and the State Employment Labor Relations Act (SELRA)[4] cover collective bargaining for municipal and state employees, respectively.[5] And since 1939, the Wisconsin Peace Act has governed collective bargaining for private employers. *See* ch. 57, Laws of 1939; WIS. STAT. §§ 111.02–111.19 (1941–42).

---

[3] MERA is found in WIS. STAT. §§ 111.70–111.77.

[4] SELRA is found in WIS. STAT. §§ 111.81–111.94.

[5] Chapter 111 also contains a subchapter regulating labor relations for public utilities. WIS. STAT. §§ 111.50–111.64.

¶16    Under the Peace Act, "[e]mployes shall have the right of self-organization and the right to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in lawful, concerted activities for the purpose of collective bargaining or other mutual aid or protection." WIS. STAT. § 111.04 (1993–94). Of key importance to this case, the Peace Act defined an "Employer" as

> a person who engages the services of an employe, and includes any person acting on behalf of an employer within the scope of his or her authority, express or implied, but shall not include the state or any political subdivision thereof, or any labor organization or anyone acting in behalf of such organization other than when it is acting as an employer in fact.

§ 111.02(7) (1993–94).

¶17    Prior to 1995, the University of Wisconsin's hospitals and clinics were operated by the University alone, and their employees were considered employees of the state. *See* WIS. STAT. §§ 36.25(13), 36.09(1)(e) (1993–94). As a public organization, the University's hospitals and clinics were subject to the University of Wisconsin Board of Regents and were required to give reports to members of the executive and legislative branches. *See* WIS. STAT. §§ 36.09(1)(j), 36.11(1)(b), 36.47 (1993–94). Moreover, since they were state employees, they were subject to the collective bargaining requirements of SELRA. *See* § 111.81(7)(a) (1993–94).

¶18    This changed in 1995 when the legislature formed a new statutory entity—the University of Wisconsin Hospitals and Clinics Authority. 1995 Wis. Act 27 § 6301 (creating WIS. STAT. ch. 233 [hereafter the Authority Statute]). The new Authority was defined as a "public body corporate and politic." *Id.*; WIS. STAT. § 233.02(1) (1995–96). And it was given the power to select and hire its own employees, assign their duties and positions, and fix their pay and benefits without the input of the state. 1995 Wis. Act 27 § 6301; WIS. STAT. § 233.10(1)–(2) (1995–96).

¶19    It was in the same act creating the Authority that the legislature took pains to place the Authority's employees under a different collective bargaining regime—this time in the Peace Act. The legislature

amended the Peace Act to explicitly include the newly created Authority in the Act's definition of an "employer":

> The term "employer" means a person who engages the services of an employe and includes any person acting on behalf of an employer within the scope of his or her authority, express or implied, but shall not include the state or any political subdivision thereof, or any labor organization or anyone acting in behalf of such organization other than when it is acting as an employer in fact. <u>For purposes of this subsection, a person who engages the services of an employe includes the University of Wisconsin Hospitals and Clinics Authority.</u>

1995 Wis. Act 27, § 3782g.[6]

¶20    The legislature also included references to the Authority's Peace Act obligations throughout the Authority Statute. Among the many collective bargaining provisions, it provided the Authority had "the duty to engage in collective bargaining with employes in a collective bargaining unit for which a representative is recognized or certified" under the Peace Act. *Id.*, § 6301j; WIS. STAT. § 233.03(7) (1995–96). The law required the governor to appoint one nonvoting member of the Authority's board "whom shall be an employe or a representative of a labor organization recognized or certified to represent employes in one of the collective bargaining units specified" in the Peace Act. 1995 Wis. Act 27, § 6301; WIS. STAT. § 233.02(1)(h) (1995–96). And it made the Authority's ability to determine the compensation and benefits of employees "[s]ubject to . . . the duty to engage in collective bargaining with employes in a collective bargaining unit for which a representative is recognized or certified" under the Peace Act. 1995 Wis. Act 27, § 6301m; WIS. STAT. § 233.10(2) (1995–96). Thus, it is undisputed that from its creation in 1995 until 2011, the Authority was a designated "employer" under the Peace Act and was required to engage in collective bargaining with its employees.

¶21    All this changed in 2011 with Act 10, a bill proposed by the governor that fundamentally transformed major features of collective

---

[6] Underlining indicates the addition from the legislature.

bargaining in Wisconsin. *See* 2011 Wis. Act 10. While Act 10 was largely aimed at removing or limiting the ability of state and municipal employees to collectively bargain under MERA and SELRA, it also made changes to the Peace Act. In particular, the legislature repealed nearly every statute that explicitly incorporated the Authority into the Peace Act and otherwise provided for collective bargaining.

¶22     Importantly, Act 10 removed the Authority from the definition of an "employer," making the statute read as it does today:

> (7)(a) "Employer" means a person who engages the services of an employee, and includes a person acting on behalf of an employer within the scope of his or her authority, express or implied.
>
> (b) "Employer" does not include any of the following:
>
> 1. The state or any political subdivision thereof.
>
> 2. Any labor organization or anyone acting in behalf of such organization other than when it is acting as an employer in fact.

WIS. STAT. § 111.02(7); *see also* 2011 Wis. Act 10, §§ 187–188.

¶23     Act 10 also removed the Authority's express duty to engage in collective bargaining that the legislature added in 1995. 2011 Wis. Act 10, § 378. It repealed the provision placing a union representative on the Authority's board. *Id.*, § 370. Act 10 deleted the provision making compensation and benefits subject to collective bargaining. *Id.*, § 372. Act 10 also instructed the Authority to negotiate compensation after the then-existing collective bargaining agreements expired under the Authority's negotiating power, not via collective bargaining under the Peace Act. *Id.*, § 9151(2). And the legislature made further changes covering strikes and lockouts along with special rules for certain employees, and it removed references to collective bargaining under the Peace Act for retirement benefits. *Id.*, §§ 66, 79, 83–85, 90, 195, 207, 209. In sum, Act 10 purged references to the Peace Act from the Authority Statute.

### 2. *The Plain Meaning of the Statutes*

¶24     So what does all of this tell us? SEIU contends that the Authority is still covered by the Peace Act and required to collectively bargain because it naturally fits the definition of an "employer" in one of two ways. First, SEIU argues that the Authority is a "person who engages the services of an employee." WIS. STAT. § 111.02(7)(a). A "person" under the Peace Act includes "corporations," and this court has previously called the Authority a "political corporation." *Rouse v. Theda Clark Med. Ctr., Inc.*, 2007 WI 87, ¶2, 302 Wis. 2d 358, 735 N.W.2d 30; § 111.02(10). Second, SEIU turns to the chapter in the Wisconsin Statutes containing the legislature's general instructions for how to construe statutes, Chapter 990. According to WIS. STAT. § 990.01, certain "words and phrases . . . shall be construed as indicated unless such construction would produce a result inconsistent with the manifest intent of the legislature." WIS. STAT. § 990.01. Under that chapter, the word "person" when used in a statute is to include "all partnerships, associations and bodies politic or corporate." § 990.01(26). SEIU reasons that, since the Authority is a public body corporate and politic, it is a "person," and through this route, fits into the definition of an employer under the Peace Act.

¶25     As an initial matter, the Peace Act generally applies to private employers, suggesting the Authority is not a "corporation" within the typical meaning of employer in the Peace Act. The definition of an "employer" explicitly excludes "the state or any political subdivision thereof"; and its list of "person[s]" qualifying to be an employer under the act includes "individuals, partnerships, associations, corporations, limited liability companies, legal representatives, trustees or receivers." WIS. STAT. § 111.02(7)(b)1., (10).

¶26     Moreover, the Authority is not defined as a corporation; it is a "public body corporate and politic." WIS. STAT. § 233.02(1). In *Rouse*, the court looked at how the Authority was structured and held that it was a "political corporation"—that is, a "corporation that is created by the state as an agency in the administration of civil government." 302 Wis. 2d 358, ¶¶22, 24, 31. The "political" aspect of the corporation concerned the Authority's "framework that is closely reviewed by the state," including "updating the state on various matters . . . annually submit[ting] a report to the governor [and] each house of the legislature . . . [and] provid[ing] on a monthly basis the secretary of administration with financial and statistical information." *Id*., ¶¶28, 32. Its "corporate" aspect was limited to the fact that it does not receive general purpose revenue, can be sued, and

can buy real estate. *Id.* It is not at all clear given the list of other entities in the definition of "person" that contemplate fully private actors, and the express exclusion of state entities from the definition of employer, that this type of "political" corporation is a natural fit as a "person" under the Peace Act.

¶27　As to SEIU's alternative argument from WIS STAT. § 990.01, it may have some initial appeal, but the statutory history conclusively shows the legislature meant for the Authority to be removed from the Peace Act. *See* WIS. STAT. § 990.01. At bottom, SEIU's argument simply cannot account for the statutory changes made by the legislature through the years.[7]

¶28　If the Authority met the general definition of an employer in the Peace Act, there would be no need to include the Authority expressly the way the legislature did in 1995. When the legislature explicitly added the Authority as an employer under the Peace Act, it did so on purpose. With good reason, we presume that a change in the statutory text is meant to effectuate a change in the law. *Lang v. Lang*, 161 Wis. 2d 210, 220, 467 N.W.2d 772 (1991). SEIU contends that the addition of the Authority to the Peace Act was simply transitional or to make it abundantly clear that the Authority was governed by the Peace Act. To be sure, the presumption that a change in a statute's text effects a change in the law can be rebutted by "a showing that the legislature has amended the statute in order to clarify an ambiguity or that the legislature has merely made more specific what has been implicit in prior statutory terminology." 82 C.J.S. *Statutes* § 494 (2025). But SEIU fails to make that showing here. SEIU's proffered reading simply does not explain the multiple provisions that expressly mandated collective bargaining and outlined specific rules for the Authority. If, as SEIU argues, the explicit references to the Peace Act in the Authority Statute were simply about providing additional clarity, we would not expect the legislature to expunge all references to the Peace Act later, as it did. In essence, SEIU's argument means the 1995 changes were largely without legal significance or effect. But in the face of the multiplicity of legislative changes, SEIU's explanation is not persuasive.

---

[7] SEIU also attempts to explain away the statutory history by arguing that we should not consider it at all if the statutory text at issue is clear on its own. As we explain above, this is not how we do statutory interpretation.

¶29     The changes brought about by Act 10 are conclusive on this point. Once again, we presume that when the legislature removed the direct reference to the Authority as a covered employer under the Peace Act, it meant to accomplish something. *Lang*, 161 Wis. 2d at 220. Act 10 was no small measure; it was broad legislation that ended or reduced collective bargaining in significant ways. It only makes sense to read Act 10's application to the Authority consistent with the many other similar changes it made to collective bargaining. The best interpretation of the statutory evidence is that by adding the Authority to the definition of an employer in 1995 and removing it in Act 10, the Authority would not have been a covered employer but for its addition in 1995, and it is now no longer a covered employer following its removal by Act 10.

¶30     Additional changes in Act 10 follow the same pattern. When the Authority was created in 1995, its board had a seat statutorily set aside for the representative of a union under the Peace Act. 1995 Wis. Act 27, § 6301. Act 10 removed this provision. 2011 Wis. Act 10, § 370. In addition, after its creation, the Authority was statutorily obligated to collectively bargain under the Peace Act for hiring, wages, pensions, and other benefits. 1995 Wis. Act 27, § 6301j. This obligation too was removed by Act 10. 2011 Wis. Act 10, § 372. Relatedly, certain new types of employees brought under the Authority were to have their compensation set by the Authority, and not pursuant to the Peace Act. 2011 Wis. Act 10, §§ 12, 9151(2). Further changes included removing protections for strikes and lockouts, removing the particular bargaining units to which Authority employees were statutorily assigned, and removing references to collective bargaining under the Peace Act for retirement benefits. 2011 Wis. Act 10, §§ 66, 79, 83–85, 90, 195, 207, 209.

¶31     It strains credulity to suggest that Act 10 was just doing non-substantive legislative cleanup and made no changes to collective bargaining for the Authority. These statutory changes tell a straightforward story. The legislature ended mandatory collective bargaining for the Authority under the Peace Act by removing the collective bargaining obligations it created in 1995.[8]

---

[8] SEIU argues that if the legislature wanted to exclude the Authority from the Peace Act, it should have listed the Authority as an exception to employers who may be covered by the Peace Act in the language of the statute. It is true that the legislature could have done so, but this would only be necessary if the legislature thought the Authority was already covered by the definition of an employer. But this statutory history makes clear both that the Authority was not

¶32    While intrinsic evidence alone makes the answer clear, the legislative history confirms our reading. *See Kalal*, 271 Wis. 2d 633, ¶51. When Act 10 was presented to the legislature, the Legislative Reference Bureau's analysis and summary of the bill stated unequivocally: "This bill eliminates the rights of [the Authority's] employees to collectively bargain." 2011 A.B. 11.

¶33    In addition, while not part of the statutes, "official legislative annotation[s]" can "provide valuable clues to the meaning of statutory text." *Waity v. LeMahieu*, 2022 WI 6, ¶27, 400 Wis. 2d 356, 969 N.W.2d 263. Since Act 10's passage, an official annotation to the statutes has read, "**NOTE: Collective bargaining under subch. I of ch. 111 for employees of the University of Wisconsin Hospitals and Clinics Authority was eliminated by 2011 Wis. Act 10**." Note, 2011, WIS. STAT. § 40.95.

¶34    Taken together, the effect of the legislature's changes in Act 10 are no mystery. When it created the Authority, the legislature added the Authority as an employer under the Peace Act and imposed numerous other collective bargaining provisions. In Act 10, the legislature eliminated the Authority as a covered employer along with other collective bargaining requirements. We therefore hold that the Authority is no longer covered by the Peace Act and is not required to collectively bargain under the Peace Act.

## IV.  CONCLUSION

¶35    The question in this case is whether, despite the changes occasioned by Act 10, the Authority is still required to engage in collective bargaining under the Peace Act. The answer is no. When we examine the statutory language along with the statutory history, we conclude that Act 10 ended the collective bargaining requirements formerly placed on the Authority. The decision of WERC is affirmed.

*By the Court.*—The decision of the circuit court is affirmed.

---

already covered and the legislature did not think it was. The Authority was not covered, so it had to be added in. And by removing it, the legislature removed the Authority as a covered employer under the Peace Act.

REBECCA GRASSL BRADLEY, J., with whom ANNETTE KINGSLAND ZIEGLER, J., joins, concurring.

¶36    Here we go again. Justice Rebecca Frank Dallet continues her campaign to overturn *State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, 271 Wis. 2d 633, 681 N.W.2d 110—the bedrock of this court's approach to statutory interpretation.[1] She insists *Kalal* is structurally unsound and wrongly applied. Neither claim is accurate. Her push to dismantle the guardrails of textualism in favor of a vague and malleable "holistic" approach to statutory interpretation—an interpretive method embraced mostly by far-left progressive jurists—would remove any remaining constraints on judicial overreach. Let's be clear: Justice Dallet's concurrence isn't merely a spirited discussion or even an invitation for measured doctrinal refinement; it's an open appeal for judges in this state to legislate from the bench. This court should stay the course and reject Justice Dallet's invitation to unmoor the judiciary from the rule of law.

¶37    Justice Dallet's concurrence begins by questioning the "basic structure" of *Kalal*'s "two-step" approach. She argues that "once we review the statutory text, it's not obvious that we should 'stop the inquiry' before considering all of the available evidence, even though *Kalal* says we 'ordinarily' do so." Justice Dallet's concurrence, ¶55 (quoting *Kalal*, 271 Wis. 2d 633, ¶45). Stopping the inquiry before considering all of the available evidence, she continues, "may actually lead us astray." *Id*. Justice Dallet fundamentally misreads *Kalal* and fails to grasp a core tenet of statutory interpretation: not all evidence is created equal—extrinsic evidence is always subordinate to intrinsic sources, and rarely relevant.

¶38    *Kalal* reminded Wisconsin's judges that our role is to interpret the laws "*enacted* by the legislature" by ascertaining their plain meaning. *Kalal*, 271 Wis. 2d 633, ¶¶44–46, 49 n.8, 51 (emphasis added); *see also Brey v. State Farm Mut. Auto. Ins. Co.*, 2022 WI 7, ¶11, 400 Wis. 2d 417, 970 N.W.2d 1. "If the meaning of the statute is plain, we ordinarily stop the inquiry." *Kalal*, 271 Wis. 2d 633, ¶45. As the majority opinion explains,

---

[1] *See, e.g.*, *Clean Wis., Inc. v. DNR*, 2021 WI 71, ¶41, 398 Wis. 2d 386, 961 N.W.2d 346 (Dallet, J., concurring) (advocating for a "holistic" approach to statutory interpretation); *James v. Heinrich*, 2021 WI 58, ¶¶76–79, 397 Wis. 2d 517, 960 N.W.2d 350 (Dallet, J., dissenting) (criticizing the majority's use of canons of statutory interpretation, which constitute the core of the textualist approach).

we come to understand a statute's plain meaning by using "all relevant intrinsic sources," majority op., ¶10 (citing *Kalal*, 271 Wis. 2d 633, ¶¶43, 46, 48–49), which include the "*textually manifest* scope, context, or purpose" of a statute, *Kalal*, 271 Wis. 2d 633, ¶49 n.8 (emphasis added), and statutory history.[2]

¶39    Justice Dallet inexplicably commingles intrinsic sources like "context and statutory history" with extrinsic sources like "legislative history," which she describes as "concededly relevant information" under *Kalal*. Justice Dallet's concurrence, ¶¶56–57. That is incorrect. *Kalal* clearly distinguishes between intrinsic and extrinsic sources. Applicable context and statutory history are always relevant because they are part of a plain meaning analysis. There is nothing "illogical" about *Kalal*'s framework as applied in this case. *Contra* Justice Dallet's concurrence, ¶58. SEIU urges us to ignore it, but statutory history is integrally part of the statutes' plain meaning analysis.

¶40    Contrary to Justice Dallet's concurrence, extrinsic sources like legislative history are generally *not* relevant at all under *Kalal*. *See State v. Hayes*, 2004 WI 80, ¶109, 273 Wis. 2d 1, 681 N.W.2d 203 (Sykes, J., concurring) (citing *Kalal*, 271 Wis. 2d 633, ¶¶50–51). The very nature of legislative history illustrates its irrelevance. Legislative history is "neither truly legislative (having failed to survive bicameralism and presentment) nor truly historical (consisting of advocacy aimed at winning in future litigation what couldn't be won in past statutes)." *BNSF Railway Co. v. Loos*, 586 U.S. 310, 329 (2019) (Gorsuch, J., dissenting). Extrinsic sources

---

[2] In *Kalal*, the court acknowledged the distinction between "legislative history" and "statutory background," the latter of which it described as "referring to previously enacted and repealed statutory provisions," i.e., statutory history. *State ex rel. Kalal v. Cir. Ct. for Dane Cnty.*, 2004 WI 58, ¶52 n.9, 271 Wis. 2d 633, 681 N.W.2d 110. Post-*Kalal* precedent has explained that statutory history is an intrinsic source and therefore plays a part in analyzing a statute's plain meaning. *See, e.g.*, *Richards v. Badger Mut. Ins. Co.*, 2008 WI 52, ¶22, 309 Wis. 2d 541, 749 N.W.2d 581; *Heritage Farm, Inc. v. Markel Ins. Co.*, 2009 WI 27, ¶15, 316 Wis. 2d 47, 762 N.W.2d 652; *United States v. Franklin*, 2019 WI 64, ¶13, 387 Wis. 2d 259, 928 N.W.2d 545; *Brey v. State Farm Mut. Auto. Ins. Co.*, 2022 WI 7, ¶20, 400 Wis. 2d 417, 970 N.W.2d 1; *Banuelos v. Univ. of Wis. Hosps. & Clinics Auth.*, 2023 WI 25, ¶25, 406 Wis. 2d 439, 988 N.W.2d 627.

like legislative history are of limited utility, and may be consulted in only two circumstances.

¶41    First, extrinsic sources might resolve an ambiguity in the statutory text. *Kalal*, 271 Wis. 2d 633, ¶51 ("[L]egislative history need not be and is not consulted except to resolve an ambiguity in the statutory language." (citing *Seider v. O'Connell*, 2000 WI 76, ¶¶51–52, 236 Wis. 2d 211, 612 N.W.2d 659)). Justice Dallet rehashes the tired trope that ambiguity lies in the "eye of the beholder." *See* Justice Dallet's concurrence, ¶62 (quoting *Kalal*, 271 Wis. 2d 633, ¶63 (Abrahamson, C.J., concurring)). I have refuted that argument in earlier cases. *See, e.g., Clean Wis., Inc. v. DNR*, 2021 WI 71, ¶89, 398 Wis. 2d 386, 961 N.W.2d 346 (Rebecca Grassl Bradley, J., dissenting). Justice Dallet's assertion reflects a profoundly cynical view of judging. Courts have a duty to apply the law as written—not to declare ambiguity where none exists in order to reach a favored policy outcome.

¶42    If judges embracing Justice Dallet's judicial philosophy believe ambiguity is a matter of personal perception instead of reasoned legal analysis, where does that lead? Does the plain meaning of a statute also exist only in the "eye of the beholder"? What about the Constitution itself? The rule of law cannot survive such relativism. We are judges, not philosophers or politicians. Our oath obligates us to serve as neutral arbiters of disputes involving the policies enacted by the People's elected representatives, not change agents. Justice Dallet's suggestion to the contrary is better left for the musings of an esoteric law review article or, better yet, the ash heap of discredited judicial digressions from the limited judicial role of declaring what the law means.

¶43    Second, extrinsic sources like legislative history are "sometimes consulted to confirm or verify a plain-meaning interpretation." *Kalal*, 271 Wis. 2d 633, ¶51 (citing *Seider*, 236 Wis. 2d 211, ¶¶51–52). Legislative history should *never* be used to refute a statute's unambiguous plain meaning.[3] At most, it "merely [] contribute[s] to an

---

[3] Because extrinsic sources like legislative history are inherently unreliable indicators of meaning, even if an extrinsic source purportedly refutes a statute's unambiguous plain meaning, it is not relevant to the inquiry. A statute's plain meaning, derived from the enacted text, is the law. "[R]ummaging through legislative history to figure out what the enactors intended" is a fool's errand when a statute's plain meaning is unambiguous. *See* ANTONIN SCALIA &

informed explanation that will firm up statutory meaning." *Teschendorf v. State Farm Ins. Cos.*, 2006 WI 89, ¶14, 293 Wis. 2d 123, 717 N.W.2d 258.

¶44 Justice Dallet concludes by arguing *Kalal*'s "formalistic requirements" are "at best a distraction, and at worst can obscure the actual considerations underlying our decisions." Justice Dallet's concurrence, ¶61. She contends the methodological approach required by *Kalal* can "amount to little more than 'a word game' to which we pay mere 'lip service.'" *Id.*, ¶62 (quoting *Teschendorf*, 293 Wis. 2d 123, ¶¶67, 70 (Abrahamson, C.J., concurring)). According to Justice Dallet, judges who pay only "lip service" to textualism—including herself—begin with their desired outcome and work backwards through the formalistic methodology that *Kalal* demands—the rule of law be damned.

¶45 The candor of Justice Dallet's admission is stunning. Apparently, she no longer feels constrained to keep the quiet part quiet. I have documented the willingness of this court's progressive majority to dispense with the rule of law in favor of their personal or political predilections. *See, e.g., Clarke v. WEC*, 2023 WI 79, ¶185, 410 Wis. 2d 1, 998 N.W.2d 370 (Rebecca Grassl Bradley, J., dissenting); *Catholic Charities Bureau, Inc. v. LIRC*, 2024 WI 13, ¶198, 411 Wis. 2d 1, 3 N.W.3d 666 (Rebecca Grassl Bradley, J., dissenting), *rev'd*, No. 24-154, slip op. at 15 (U.S. June 5, 2025) ("There may be hard calls to make in policing" the "fundamental" rule that "the government maintain 'neutrality between religion and religion,'" "but this is not one." (quoting another source)); *Priorities USA v. WEC*, 2024 WI 32, ¶51, 412 Wis. 2d 594, 8 N.W.3d 429 (Rebecca Grassl Bradley, J., dissenting); *Wis. Voter Alliance v. Secord*, 2025 WI 2, ¶62, 414 Wis. 2d 348, 15 N.W.3d 872 (Rebecca Grassl Bradley, J., dissenting); *WEC v. LeMahieu*, 2025 WI 4, ¶43 n.2, 414 Wis. 2d 571, 16 N.W.3d 469 (Rebecca Grassl Bradley, J., concurring). Perhaps emboldened by electoral success, its members begin to admit it.

¶46 Justice Dallet can call her methodology whatever she wants—"holistic" or "comprehensive"—but the label doesn't matter. It isn't based on anything more than what she feels is "relevant" to support her preferred outcome in a particular case. This sort of ad hoc approach to

---

BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 390–98 (2012). "To be 'a government of laws, not of men' is to be governed by what the laws *say*, and not by what the people who drafted the laws intended." *Id.* at 375.

judging is destined (if not designed) to allow a judge's own personal motives and cognitive biases to displace her neutrality. Justice Dallet's claim that *Kalal*'s formalistic framework is vulnerable to bad-faith manipulation amounts to nothing more than blatant projection. "[T]here is a world of difference between an objective test (the text)—which sometimes provides no clear answer, thus leaving the door open to judicial self-gratification—and tests that invite judges to say that the law is what they think it ought to be." ANTONIN SCALIA & BRIAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 22 (2012).

¶47    *Kalal* stands as a legal pillar, which has guided Wisconsin's judiciary to apply venerable principles of statutory interpretation long predating Wisconsin's statehood. Justice Dallet "operate[s] [] in [*Kalal*'s] shadow" and continues to chip away at the textualism *Kalal* espouses because she "prefer[s] an alternative methodology that is far more inclusive of extrinsic sources and policy considerations." *Cf.* Daniel R. Suhr, *Interpreting Wisconsin Statutes*, 100 MARQ. L. REV. 969, 995 (2017). Should three more justices adopt her methodology, the rule of law shall be consigned to burn in perdition's flames.

REBECCA FRANK DALLET, J., with whom ANN WALSH BRADLEY, C.J., JILL J. KAROFSKY, and JANET C. PROTASIEWICZ, JJ., join, concurring.

¶48     Twenty-one years ago, in *State ex rel. Kalal v. Circuit Court for Dane County*, our court declared that "the general framework for statutory interpretation in Wisconsin requires some clarification." 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110. Over the ensuing nine paragraphs, the majority opinion purported to declare in exhaustive fashion "[t]he principles of statutory interpretation . . . rooted in and fundamental to the rule of law." *Id.*, ¶52.

¶49     The year *Kalal* was decided, then-Justice Ann Walsh Bradley predicted that these new principles of statutory interpretation would "be often mouthed but not always applied." *State v. Hayes*, 2004 WI 80, ¶67, 273 Wis. 2d 1, 681 N.W.2d 203 (Ann Walsh Bradley, J., concurring). And moving forward, she foresaw a "well intentioned," "continuing," and "vigorous discussions of statutory interpretation." *Id.*, ¶68.

¶50     Chief Justice Ann Walsh Bradley's predictions have come to pass. In the two decades since it was decided, *Kalal* is surely our most cited case. It has been referenced in nearly 1,500 Wisconsin appellate decisions, more than 400 from this court alone.[1] In that time, some members of this court have heralded *Kalal* for embracing a "neutral, text-based methodology," that is the only antidote to a "'freewheeling method of statutory interpretation' that prioritizes results over text."[2] Others, myself included, have criticized *Kalal* and some of the cases applying it for

---

[1] These numbers are based on a search of Westlaw's citation references shortly before this opinion was released. An article published in 2022 estimated that in the first 18 years after it was decided, *Kalal* was cited "on average once every six days" in an appellate decision in Wisconsin. *See* Anuj C. Desai, *Modified Textualism in Wisconsin: A Case Study*, 2022 WIS. L. REV. 1087, 1087.

[2] *Clean Wis., Inc. v. DNR*, 2021 WI 71, ¶¶86, 92, 398 Wis. 2d 386, 961 N.W.2d 346 (Rebecca Grassl Bradley, J., dissenting) (quoting *State v. Hayes*, 2004 WI 80, ¶102, 273 Wis. 2d 1, 681 N.W.2d 203 (Sykes, J., concurring)).

adopting an overly rigid and formalistic, rather than holistic, method of statutory interpretation.[3]

¶51    I write separately to add another chapter to our court's ongoing conversation about how best to interpret statutes. In doing so, I note that although a majority of the court joins this opinion, it does not overrule *Kalal*, or purport to bind our court or any other to use any particular methodology when interpreting statutes in the future.[4]

¶52    I begin with one common way of describing *Kalal*, namely as a kind of multi-step "statutory interpretation rulebook." Step one, consider the text and other sources intrinsic to the law itself like context and structure ("intrinsic sources"). If the meaning appears clear, we may stop there, or go on to "confirm" that plain-text interpretation by using sources extrinsic to the law itself like legislative history ("extrinsic sources"). Step two, if the statute is labeled ambiguous after step one, consider extrinsic sources to resolve the ambiguity.

¶53    We see this vision of *Kalal* on display in some of our cases, which describe it as adopting a multi-step approach for statutory interpretation that begins with only preferred, intrinsic sources like the text and moves on to disfavored extrinsic sources like legislative history only if we label the statute ambiguous.[5] The court of appeals has done the

---

[3] *See Clean Wis.*, 398 Wis. 2d 386, ¶¶41–44 (Dallet, J., concurring); *see also James v. Heinrich*, 2021 WI 58, ¶¶76–79, 397 Wis. 2d 517, 960 N.W.2d 350 (Dallet, J., dissenting); *Kalal*, 271 Wis. 2d 633, ¶¶66, 71 (Abrahamson, C.J., concurring).

[4] As explained more fully below, the parties' briefing and arguments focused extensively on how to apply *Kalal*. Nevertheless, no party asked us to revisit it.

[5] *See, e.g.*, *Lamar Cent. Outdoor, LLC v. Div. of Hearings & Appeals*, 2019 WI 109, ¶36, 389 Wis. 2d 486, 936 N.W.2d 573 (describing *Kalal* as having a "first step" and a "next step"); *DaimlerChrysler v. LIRC*, 2007 WI 15, ¶37, 299 Wis. 2d 1, 727 N.W.2d 311 ("The first step of statutory interpretation is to look at the language of the statute . . . ."); *see also Deutsche Bank Nat'l Tr. Co. v. Wuensch*, 2018 WI 35, ¶21, 380 Wis. 2d 727, 911 N.W.2d 1 ("[W]e begin with the language of the relevant statutes, a step the court of appeals mostly relegated to footnotes.")

same.[6] And so too have some scholars who describe *Kalal* and other cases like it as "ranking interpretive tools in a clear order," with consideration of those tools proceeding in specifically delineated steps. *See* Abbe R. Gluck, *The States as Laboratories of Statutory Interpretation: Methodological Consensus and the New Modified Textualism*, 119 YALE L.J. 1750, 1758 (2010); *see also* Adam M. Samaha, *If the Text Is Clear—Lexical Ordering in Statutory Interpretation*, 94 NOTRE DAME L. REV. 155, 157 (2018).

¶54    In this case, the parties also hold this basic view of *Kalal* and spend much of their briefing debating where statutory history—the previously enacted versions of the statute—fits within its supposed multi-step rulebook. According to SEIU, statutory history is appropriately considered at step one of *Kalal* only for the narrow purpose of confirming a plain meaning interpretation or more broadly at step two, to reveal the meaning of an ambiguous statute. In other words, SEIU argues that we should treat statutory history like an extrinsic source. The Authority, by contrast, argues that because statutory history is in fact an intrinsic source, it is always appropriate to consider it at *Kalal*'s first step, since intrinsic sources are "part and parcel of a plain meaning interpretation." *Banuelos v. Univ. of Wis. Hosps. & Clinics Auth.*, 2023 WI 25, ¶25, 406 Wis. 2d 439, 988 N.W.2d 627. Setting this dispute aside for the moment, however, there are at least two problems with *Kalal*'s two-step approach: one with its basic structure, and another with its application.

¶55    At first glance, *Kalal*'s two-step structure might seem self-evidently correct. Everyone, myself included, agrees that "[w]e should of course start with the text of the statute," since it is the best available evidence of what the statute means. *See Clean Wis., Inc. v. DNR*, 2021 WI 71, ¶43, 398 Wis. 2d 386, 961 N.W.2d 346 (Dallet, J., concurring). But once we review the statutory text, it's not obvious that we should "stop the inquiry" before considering all of the available evidence, even though *Kalal* says we "ordinarily" do so. *Kalal*, 271 Wis. 2d 633, ¶45 (quoting another source). In fact, doing that may actually lead us astray.

---

[6] *See, e.g., Rose v. Rose*, 2024 WI App 64, ¶17, 414 Wis. 2d 305, 14 N.W.3d 707 ("[I]f the text of a statute is indeed ambiguous . . . the next step is to . . . look[] to extrinsic sources such as legislative history." (citing *Kalal*, 271 Wis. 2d 633, ¶¶47–51)).

¶56 The reason why is that "the basic structure of" *Kalal*'s two-step approach tells us we can sometimes ignore relevant evidence of statutory meaning. *See* William Baude & Ryan Doerfler, *The (Not So) Plain Meaning Rule*, 84 U. CHI. L. REV. 539, 540 (2017). Everyone agrees that intrinsic sources like context and statutory history are relevant to understanding what even straightforward statutory language means. *See id.* That is why we frequently underscore the importance of reviewing these sources in addition to the text. *See, e.g., Sojenhomer LLC v. Village of Egg Harbor*, 2024 WI 25, ¶15, 412 Wis. 2d 244, 7 N.W.3d 455; *Banuelos*, 406 Wis. 2d 439, ¶25. And even *Kalal* itself acknowledges that extrinsic information like legislative history can also be relevant to determining what statutory text means, explaining that we can use it to "confirm" our interpretation of an apparently unambiguous text, or to reveal the meaning of an ambiguous one. *See Kalal*, 271 Wis. 2d 633, ¶¶50–51.

¶57 Yet *Kalal* tells us that we can, as a general rule, ignore that concededly relevant information if the text is sufficiently clear. *See id.* This is "quite puzzling," however, since information is either relevant or it is not; "[i]nformation that is relevant shouldn't normally become irrelevant just because the text is clear." Baude & Doerfler, *supra*, at 540. "And vice versa, irrelevant information shouldn't become useful just because the text is less than clear." *Id.* As Judge Henry Friendly put it, it is "[i]llogical . . . to hold that a 'plain meaning' shut[s] off access to the very materials that might show it not to have been plain at all . . . ." HENRY J. FRIENDLY, MR. JUSTICE FRANKFURTER AND READING OF STATUTES (1964), *reprinted in* BENCHMARKS 206 (Univ. of Chi. Press 1967).

¶58 This illogical aspect of *Kalal*'s two-step approach is on full display in SEIU's argument in this case. In essence, SEIU asks us to ignore the statutory history of WIS. STAT. § 111.02(7)(a) because its text is sufficiently clear, even if the statutory history might help illuminate the correct—though not necessarily obvious—meaning of that text. In other words, SEIU asks us to sacrifice interpretive accuracy in service of a rigid application of *Kalal*'s two-step framework. And importantly, even if our decision today reaffirms statutory history's place at step one of *Kalal*'s framework, we are still making a similar, though perhaps less dramatic, sacrifice by excluding relevant extrinsic information like legislative history from the interpretive process when a statute appears to be clear.

¶59 One might try to justify that sacrifice by arguing that *Kalal*'s framework makes it easier for courts to decide statutory cases, either by (1) reducing the burden of reviewing voluminous or cumulative extrinsic

evidence or (2) by preventing courts from getting distracted by unreliable information. The burden argument makes little sense since *Kalal* tells us we can exclude even relevant information that we already know (for example, because the parties brought it to our attention) or could easily gather. What's more, neither the burden of reviewing extrinsic evidence nor its occasional unreliability can justify only excluding relevant extrinsic information when the text seems clear. *See* Baude & Doerfler, *supra* at 549–54. After all, it is just as burdensome to review voluminous or potentially cumulative legislative history when a statute is unclear as when the statute is clear. And there is no reason to think that the reliability of the legislative history or any other extrinsic source is inversely proportional to the clarity of the text.

¶60 In fact, nothing about the relative reliability of the available sources of legislative evidence justifies *Kalal*'s two-step framework. Acknowledging that the statutory text is the law, and thus that it is the best evidence of what the statute means, certainly justifies giving the text more weight in the analysis. Similarly, acknowledging that legislative history is sometimes uninformative or unreliable will often justify giving it little or no weight. *See Clean Wis.*, 398 Wis. 2d 386, ¶44 (Dallet, J., concurring). But giving some types of evidence more or less weight doesn't imply that we shouldn't consider all of the evidence, or consider some types of evidence only sometimes, such as when we label a statute ambiguous. *See* Samaha, *supra*, at 177–80. We see this point clearly in jury trials. Under the rules of evidence, relevant information is almost always admissible, but we leave it up to the jury to determine how much weight to give that evidence. We don't tell juries, for example, to consider direct evidence first and, only if their verdict after doing so is unclear, evaluate circumstantial or indirect evidence second. If we trust juries with the task of sorting through the relevant evidence, assigning it the appropriate weight, and coming to a rational conclusion without following a rigid framework, then we should trust judges to do the same.

¶61 In addition to the basic structural flaw inherent in *Kalal*'s two-step approach, applying its formalistic requirements literally is at best a distraction, and at worst can obscure the actual considerations underlying our decisions. To state the obvious, our task in a statutory interpretation case isn't to figure out what labels *Kalal* tells us to put on the statute at issue (ambiguous or unambiguous?), or to determine, as a result of those labels, whether we are supposed to consider or ignore various intrinsic or extrinsic sources. *See, e.g., Clean Wis.*, 398 Wis. 2d 386, ¶¶41–43 (Dallet, J., concurring). Instead, our job is—of course—to figure

out what the statute means. Yet as we see in the parties' arguments in this case and occasionally in our opinions, focusing too much on labeling statutes can distract us from that important task and transform a debate about what the statute means into a debate about what *Kalal* says.[7]

¶62    Moreover, these labels can amount to little more than "a word game" to which we pay mere "lip service . . . ." *Teschendorf v. State Farm Ins. Cos.*, 2006 WI 89, ¶¶67, 70, 293 Wis. 2d 123, 717 N.W.2d 258 (Abrahamson, C.J., concurring). As Chief Justice Abrahamson often observed, "the distinction between 'plain' and 'ambiguous' is in the eye of the beholder; and both words too often are conclusory labels a court pins on a statute . . . ." *Kalal*, 271 Wis. 2d 633, ¶63 (Abrahamson, C.J., concurring) (footnotes omitted); *see also Teschendorf*, 293 Wis. 2d 123, ¶67 n.3 (Abrahamson, C.J., concurring) (collecting cases). What's worse though, is that we often apply these labels in ways we cannot mean. For example, our cases often assert that "a statute is ambiguous if it is capable of being understood by reasonably well-informed persons in two or more senses." *Kalal*, 271 Wis. 2d 633, ¶47. But different members of this court often understand statutes in two or more senses, to say nothing of the cases where we see a statute differently than the court of appeals. "What [those] opinion[s] do[] not tell us," however, "is which members of the court of appeals or this court are not 'reasonably well-informed persons . . . .'" *Teschendorf*, 293 Wis. 2d 123, ¶68 (Abrahamson, C.J., concurring).

¶63    This is not the only way in which applying *Kalal*'s formalistic labels obscure our genuine interpretive process. Our opinions often say, for example, that we concluded that a statute is unambiguous

---

[7] For example, many cases feature disagreements about how sources like statutory history, canons of construction, or the absurd-results doctrine should fit into the *Kalal* framework. *See, e.g., County of Dane v. LIRC*, 2009 WI 9, ¶¶49–50, 315 Wis. 2d 293, 759 N.W.2d 571 (Abrahamson, C.J., concurring); *James*, 397 Wis. 2d 517, ¶¶76–78 (Dallet, J., dissenting); *Force ex rel. Welcenbach v. Am. Fam. Mut. Ins. Co.*, 2014 WI 82, ¶134, 356 Wis. 2d 582, 850 N.W.2d 866 (Prosser, J., concurring). And still others feature disagreements over whether a statute is ambiguous or not, which is often merely a proxy fight over whether certain sources are in or out of bounds. *See, e.g., Teschendorf v. State Farm Ins. Cos.*, 2006 WI 89, ¶18, 293 Wis. 2d 123, 717 N.W.2d 258; *Clean Wis.*, 398 Wis. 2d 386, ¶42 (Dallet, J., concurring).

without reviewing extrinsic sources. *See Kalal*, 271 Wis. 2d 633, ¶46. But we always say that after reviewing all of the parties' briefing and hearing argument—briefing and argument that often relies on the legislative history and other extrinsic sources. For that reason, "how can it be said that the judge turned to legislative history only after finding the statutory language ambiguous? The judge [herself] often cannot identify exactly when [her] perception of the words actually jelled." A. Raymond Randolph, *Dictionaries, Plain Meaning, and Context in Statutory Interpretation*, 17 HARV. J. L. & PUB. POL'Y 71, 76 (1994).

¶64 Something similar is happening when, as we often do, we use legislative history or other extrinsic sources to "confirm" our interpretations of supposedly unambiguous statutes. *See* majority op., ¶32; *see also, e.g., United States v. Franklin*, 2019 WI 64, ¶14, 387 Wis. 2d 259, 928 N.W.2d 545. Using legislative history to "confirm" an interpretation is still relying on it, however, and treating it as a relevant source of information about the statute's meaning. And even more to the point, it is a fiction to say that we are using this information only to "confirm" our interpretation when we knew it from the outset, and clearly relied on it in reaching our decision.

¶65 Rather than treat *Kalal* like an ironclad rulebook of statutory interpretation, I would dispense with its fictions and formalistic labels. Instead, we should embrace the "more comprehensive" and "holistic" approach to statutory interpretation that I have advocated for before. *Clean Wis.*, 398 Wis. 2d 386, ¶43 (Dallet, J., concurring). Under that approach, we should of course start with the text of the statute but also be "upfront and honest about considering relevant extrinsic sources to interpret a statute's meaning," conscious of course of those sources' limitations. *Id.; see also James v. Heinrich*, 2021 WI 58, ¶68 n.3, 397 Wis. 2d 517, 960 N.W.2d 350 (Dallet, J., dissenting). Doing that would allow us to focus less on labeling statutes ambiguous or unambiguous or arguing about where a particular source fits in *Kalal*'s one-size-fits-all hierarchy and more on our real task, interpreting statutes.

¶66 Before concluding, I want to address the other concurrence's hyperbolic claim that embracing such an approach would "consign[]" "the rule of law . . . to burn in perdition's flames." Justice Rebecca Grassl Bradley's concurrence, ¶47. I'm confident in the reader's ability to sort out reason from rhetoric, and to recognize that considering relevant and reliable legislative history when interpreting statutes won't condemn the rule of law to eternal damnation. Nevertheless, at a time when the rule of

law is genuinely threatened we—judges and citizens alike—must avoid demonizing those with whom we disagree and instead engage in good faith with opposing viewpoints. Only by doing that can we truly preserve the rule of law. Accordingly, I join the majority opinion in full and respectfully concur.